Thomas **BURKA, Eugene Avent, Frank Doe, Tracey Devlin, Fitzgerald Cumberbatch, and Felix Arce, on behalf of themselves and all others similarly situated, Plaintiffs,**

**James Salazar, Plaintiff–Intervenor,**

v.

**NEW YORK CITY TRANSIT AUTHORITY, David L. Gunn, individually and in his official capacity as President of the New York City Transit Authority, and his successors in office; Robert F. Kiley, individually and in his official capacity as Chairman of the New York City Transit Authority, and his successors in office; William I. Buchanan, III, individually and in his official capacity as Assistant Manager of Labor Relations for the New York City Tran-**

---

sit Authority, and his successors in office; Richard Mandel, individually and in his official capacity as the Acting Medical Director of the New York City Transit Authority, and his successors in office, Defendants.

John FA, Plaintiff,

v.

NEW YORK CITY TRANSIT AUTHORITY and David L. Gunn, individually and as President of the New York City Transit Authority, Defendants.

Nos. 85 Civ. 5751(RPP), 86 Civ. 6536(RPP).

United States District Court, S.D. New York.

June 6, 1990.

The Legal Action Center of the City of New York, Inc., New York City, Margaret K. Brooks, Ellen M. Weber, Edward J. Davis, for Burka plaintiff class.

Gladstein, Reif & Meginniss, New York City, James Reif, for plaintiff-intervenor James Salazar.

Brooklyn Legal Services Corp. B, Brooklyn, N.Y., Jane Greengold Stevens, for plaintiff John Fa.

New York City Transit Authority Office of Mr. Albert C. Cosenza, Gen. Counsel, Brooklyn, N.Y., Eugene Freidus, Deborah E. Collins, for defendants.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

This is a consolidation of challenges to the urine testing procedures utilized by the New York City Transit Authority (the TA) since January 1, 1984 to test for use of marijuana.[1] The plaintiffs seek both monetary and equitable relief. During the trial of this case, the Court approved the parties' agreement to bifurcate the issues of liability and remedy. This Opinion represents only the Court's findings of fact and conclusions of law on liability.

### Background

Defendant TA is a public benefit corporation created by New York Public Authorities Law to operate New York City's public transit facilities, including subway and bus systems. The individual defendants are the TA President, the TA Chairperson, the TA Medical Director and the TA's Assistant Vice President for Labor Relations. The evidence does not show, and the plaintiffs have not contended in their trial briefs, proposed findings of fact and proposed conclusions of law, that the individual defendants ever violated the Constitution without reasonable grounds for believing their actions were constitutional. Accordingly, the individual defendants have qualified immunity and cannot be held liable in their personal capacity. *See Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (qualified immunity when officials do not act maliciously and without reasonable grounds for believing their actions were constitutional); *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

The plaintiffs consist of representatives of three subclasses certified pursuant to Federal Rule of Civil Procedure 23, as well as the individual plaintiff John Fa, and plaintiff-intervenor James Salazar. All of the plaintiffs were either permanent or probationary employees or were applicants, who have been or will be denied employment or a promotion, suspended, required to undergo drug counseling, terminated or otherwise penalized solely because of a marijuana positive urinalysis test. *Burka v. New York City Transit Authority*, 110 F.R.D. 595, 600 (S.D.N.Y.1986) (Goettel, J.).

The three certified subclasses, as described by Judge Goettel, are:

(A) those TA employees who deny drug use but who have been or in the future will be subjected to adverse employment action based on drug-positive test results obtained pursuant to a periodic physical examination, a promotion application or an on-duty incident ("Subclass A");

(B) those TA employees who admit to off-duty drug use and who have been or in the future will be subjected to adverse employment action due to testing connected with the above activities ("Subclass B");

(C) those applicants for positions with the TA who deny drug use and who have been or in the future will be denied employment based on drug-positive test results ("Subclass C").

*Burka v. New York City Transit Authority*, 121 F.R.D. 215, 216 (S.D.N.Y.1988). These subclasses may assume a greater significance in the determination of remedies, but at this point it is important to note that the subclasses, including plaintiff-intervenor Salazar and plaintiff Fa, neither include nor represent either (1) applicants who admit to drug use, (2) employees tested solely due to supervisor's suspicion, or (3) employees tested because a prior test revealed evidence of drug use. *Id.* at 216 n. 2.

Plaintiffs represent employees from whom urine has been taken in four circumstances since January 1, 1984: (1) following an extended absence or suspension, (2) as part of certain periodic physical examinations, (3) as part of a physical examination for promotion, (4) when directed by a su-

---

**1.** This challenge only encompasses individuals who tested positive solely for marijuana. It does not cover individuals who refused to take the test or individuals who tested positive for drugs other than or in addition to marijuana. When the term "drug" is used, unless otherwise specified, the Opinion is referring to marijuana.

pervisor or manager following an "incident" that occurs while on-duty.[2] In addition, the plaintiffs represent applicants who deny drug use and tested positive for marijuana since October 1984.[3]

All plaintiffs present parallel challenges and the claims were consolidated for purposes of trial. On February 1, 1988, Judge Goettel granted summary judgment for defendants on all issues except for the due process claims of employees, and the privacy and unreasonable search and seizure claims. *Burka v. New York City Transit Authority*, 680 F.Supp. 590, 612 (S.D.N.Y. 1988). Those surviving claims are based upon clauses in both the federal and New York State Constitutions. The federal constitutional challenges are brought pursuant to 42 U.S.C. § 1983.[4]

A non-jury trial took place from April 14, 1989 through May 24, 1989. The parties submitted proposed findings of fact and conclusions of law on September 15, 1989. Evidence was only presented at trial of the TA's testing procedures through April 1987. The parties have each subsequently submitted generalized descriptions of the post-April 1987 testing procedures; however, these descriptions do not constitute an adequate evidentiary basis for a determination of constitutionality. Accordingly, this Opinion only determines the lawfulness of TA drug testing from January 1, 1984 to April 1987.

In October 1989, the lawyers for the certified subclasses submitted for the Court's approval a consent order to settle the due process "accuracy of testing" claims of those tested from January 1984 through September 1984 by the Laboratory for Chromatography. After a public hearing and several submissions from the parties, the Court issued an opinion approving the agreement subject to certain modifications. *See* Opinion and Order of January 22, 1990. The parties agreed to the modifications and the consent order was finally approved on February 1, 1990.

On March 29, 1990, the Court held a conference at which it requested additional submissions addressing the costs and effectiveness of alternative, on-site drug testing procedures. On May 10, 1990, the parties submitted a joint stipulation of facts, expert affidavits and legal memoranda discussing the availability of on-site drug testing procedures and whether the implementation of on-site testing was constitutionally mandated.

### Discussion

This Court is not asked to rule on whether there is a substantive due process right to ingest marijuana. Plaintiffs do not directly challenge the current unlawful status of marijuana use under state and federal law. Nor do plaintiffs call into question the rights of the TA either to discipline an employee who ingests marijuana during his spare time or to refuse to hire an applicant who does the same. *See National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 1398, 103 L.Ed.2d 685 (1989) (Scalia, J., dissenting) (government "employees can constitutionally be denied promotion, or even be dismissed, for a single instance of unlawful drug use, at home or at work").

Instead, these actions are directed at the procedures utilized by the TA to determine whether plaintiffs were contemporaneously using marijuana. In particular, plaintiffs argue that the TA conducted drug testing in a manner which (1) constituted unlawful searches and seizures and (2) resulted in deprivations of interests in property and liberty without due process of law. The search and seizure claims focus on the reasonableness of the decision to take urine, while the due process claims focus on

---

**2.** In July 1985, the TA modified its rules to authorize post-accident testing as well. It appears, however, that previously "accident" was included in the term "incident."

**3.** From 1984 through 1986, approximately 673 employees and 1,421 applicants tested positive solely for marijuana. It is not known at this time what portion of those figures are represented by each of the plaintiff subclasses.

**4.** Judge Goettel also denied defendants' motion for summary judgment on plaintiff Fa's claim of collateral estoppel. For organizational purposes, this claim is included at the end of this Opinion's due process discussion.

whether adequate procedural safeguards accompanied the determination that, based on the urine sample, one is a user of marijuana.

For purposes of determining plaintiffs' rights to sue under Section 1983, as well as the due process clauses and the search and seizure clauses of the state and federal constitutions, the acts of the TA are attributable to a local government entity. *See West v. Atkins*, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) ("under color of state law" requirement is conterminous with state action doctrine of Fourteenth Amendment). New York statute authorizes the TA to perform "an essential governmental function." New York Public Authorities Law §§ 1201, 1207–g. Accordingly, the TA acts as a local arm of government and "under color of" state law. *See, e.g., New York City Transit Authority v. Beazer*, 440 U.S. 568, 587, 99 S.Ct. 1355, 1366, 59 L.Ed.2d 587 (1979) (TA is "a governmental unit" for purposes of Fourteenth Amendment analysis); *Kissinger v. New York City Transit Authority*, 274 F.Supp. 438, 441 (S.D.N.Y.1967) (TA decisions are "state action"); *see also Subway–Surface Supervisors Association v. New York City Transit Authority*, 44 N.Y.2d 101, 404 N.Y.S.2d 323, 329, 375 N.E.2d 384 (1978). The findings of constitutional infringements are limited to those acts constituting a component of patterns of practice, customs or policies of the TA. *Monell v. New York City Department of Social Services*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978).

## I. *Search & Seizure*

 Plaintiffs argue that the TA took urine from employees and applicants in an unconstitutional manner. The Fourth Amendment's prohibition against unreasonable searches and seizures applies to searches and seizures authorized by the TA, an arm of the state and municipal governments. *Skinner v. Railway Labor Executives Association*, 489 U.S. 602, 109 S.Ct. 1402, 1411, 103 L.Ed.2d 639 (1989).

Under Supreme Court precedent, the TA's taking of urine from a public employee or an applicant constitutes a search [5] and "must meet the reasonableness requirement of the Fourth Amendment." *Von Raab*, 109 S.Ct. at 1390; *Skinner*, 109 S.Ct. at 1412–13; *see also O'Connor v. Ortega*, 480 U.S. 709, 717, 107 S.Ct. 1492, 1497, 94 L.Ed.2d 714 (1987) (plurality opinion) (Fourth Amendment protects government employees from unreasonable searches). The reasonableness of a search depends upon a balance of individual privacy interests and legitimate government interests. *Von Raab*, 109 S.Ct. at 1390; *Skinner*, 109 S.Ct. at 1414.

### A. Warrant Requirement

Whether the TA may dispense with the Fourth Amendment's warrant requirement depends on a balance of the individual interests and the government interests at stake in having a warrant requirement.

#### 1. *Individual Interests*

The Fourth Amendment provides:

[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

A warrant provides the individual with the protection of "the detached scrutiny of a neutral magistrate" to ensure that "such intrusions are not the random or arbitrary acts of government agents." *Skinner*, 109 S.Ct. at 1415. A warrant not only restrains the government from engaging in unreasonable practices, but also functions as a manifestation which provides individuals with assurance that "the intrusion is authorized by law, and that it is narrowly limited in its objectives and scope." *Von Raab*, 109 S.Ct. at 1391; *Skinner* 109 S.Ct. at 1415.

Individual interests protected by the warrant requirement are reduced when the search is (1) preceded by notice, and (2)

---

**5.** The characterization of the taking of a urine sample as a Fourth Amendment search adequately protects any Fourth Amendment seizure interests which the TA's urine taking procedures may implicate. *Skinner*, 109 S.Ct. at 1413 & n. 4.

# 820

administered subject to "minimal discretion." *Skinner*, 109 S.Ct. at 1415–16.

The TA has made efforts to provide notice to employees of the drug testing rules. The testimony shows that those efforts did not meet the standard of "doubtless" success in notifying all employees of future drug testing, achieved by the government in *Skinner* and *Von Raab*, cases in which the Supreme Court held that a warrant was not required. *Compare* Tr. 34, 124, 191, 258, 336, 364–68 (notified of laboratory testing of urine, but scope of the test unspecified); Ex. 106 at 34, ¶ 8(e); Ex. 107 at 47–50, *with Skinner*, 109 S.Ct. at 1415 (rules on urinalysis "doubtless are well known to covered employees"); *Von Raab*, 109 S.Ct. at 1391.

A review of the "minimal discretion" found present in *Von Raab* and *Skinner* is useful before determining whether the TA plan satisfies this second individual interest protection factor. In *Skinner*, urine could only be taken after there had been a "major train accident," an "impact accident," a fatality to an on-duty railroad employee, a reasonable suspicion by a supervisor after a "reportable accident or incident," certain rule violations, or suspicion of impairment by two supervisors—one of whom had training in detecting drug use. 109 S.Ct. at 1408–09. Regulations defined the terms "major accident" and "impact accident" with a limited list of specified events. *Id.* In *Von Raab*, the Customs Service tested individuals after deeming them initially qualified and before final selection. 109 S.Ct. at 1388. This suit challenges the taking of urine under four circumstances. *See supra* text accompanying note 2. The only circumstance which lacks the minimal discretion present in the Supreme Court cases is testing after an "incident," because that term is not defined by a narrow list of circumstances. Nevertheless, the use of the term "incident" does not grant perilously broad authority to order a drug test at any time for an arbitrary reason and the evidence does not show that the TA has used its discretion in an arbitrary manner. *See Dent v. New York City Transit Authority*, N.Y.L.J., May 10, 1990, at 28 (N.Y.Sup.Ct. May 7, 1990) ("proviso that there be an 'unusual incident' before the employee submits to a drug test serves to prevent unbridled discretion on the part of the TA").

2. *Government Interests in Preventing Drug Users From Engaging in Safety–Sensitive Tasks*

The government interest prong dictates against a warrant requirement when "the intrusion serves special governmental needs, beyond the normal need for law enforcement." *Von Raab*, 109 S.Ct. at 1390–91. The government's interest in preventing drug users from "engag[ing] in safety-sensitive tasks" in public transportation presents one such "special need." *Skinner*, 109 S.Ct. at 1414–15.

Before determining whether TA jobs involve safety-sensitive tasks, it is first necessary to address plaintiffs' two threshold arguments that there could not be any safety interests related to the TA's urinalysis program. First, plaintiffs contend that marijuana does not cause impairment of performance. The expert testimony on this issue varied from one extreme to the other. Defendants' expert, Dr. Jack H. Mendelson, testified that marijuana can have an effect lasting for days during which the user may experience delusions and serious interference with motor coordination. On the other extreme, Dr. Reese Jones testified, for the plaintiffs, that marijuana only has an effect for three hours, during which "significant performance impairment" does not necessarily result. Tr. at 2635. Dr. Jones' conclusions rest upon a theory that "the nature of the way the human system works [is] that you have alternative pathways to get things done ... if we are impaired in system A we can throw in system B and still function." Tr. at 2635. The studies supplied to the Court by defendants and upon which Dr. Jones was cross-examined, Tr. at 2671–74, show that these "alternative pathways" do not function as well for some as for others in all situations. The evidence shows that marijuana use results in impairment of one's motor functions for at least a few hours and if an employee smoked a marijuana cigarette during a break or before work then he or

she would more than likely be impaired during working hours.

Plaintiffs' second argument is that urinalysis does not identify on-duty impairment and therefore there can be no connection between the TA's testing and safety concerns. Even though urinalysis is not necessarily determinative of impairment from marijuana while on-duty, the *Von Raab* decision approved urine testing as a means of preventing those who carry fire arms from being impaired while on-duty. *See Jones v. Jenkins*, 878 F.2d 1476, 1477 (D.C.Cir.1989) (per curiam). The TA's urine testing program is also a means for prevention of on-duty impairment from marijuana use. Plaintiff's argue that supervisors properly trained in detecting marijuana impairment would be a less intrusive and equally effective alternative. While supervisors could in certain instances screen employees and thus be able to prevent an impaired worker from causing an injury, the weight of the evidence that supervision would be an adequate means for identifying and deterring impairment was less than the preponderance. Tr. 1647–49. *See also Fowler v. New York City Department of Sanitation*, 704 F.Supp. 1264, 1275 (S.D.N.Y.1989) (citing expert testimony and *Mulholland v. Department of Army*, 660 F.Supp. 1565, 1569 (E.D.Va. 1987)). There may be means more effective than urinalysis with which to supplement supervision in order to identify and to prevent on-duty impairment, but the selection of a cost-effective alternative is not a choice for the judiciary. Accordingly, urinalysis is found to be a suitable means for addressing safety concerns and the issue remaining is whether the TA possesses surpassing safety interests, as regards each of its occupational categories.

A "safety-sensitive task" is "fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Skinner*, 109 S.Ct. at 1419; *Von Raab*, 109 S.Ct. at 1393. Chief Judge Wald, writing for a panel of the D.C. Circuit after the *Skinner* and *Von Raab* decisions, elaborated that a safety-sensitive position is not one in which the threat to the public is "through a chain of ensuing circumstances" or an "indirect risk." *Harmon v. Thornburgh*, 878 F.2d 484, 491 (D.C.Cir.1989), cert. denied sub nom., *Bell v. Thornburgh*, —— U.S. ——, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990). The *Harmon* decision further explained:

> The public safety rationale adopted in *Von Raab* and *Skinner* focused on the *immediacy* of the threat. The point was that a single slip-up by a gun-carrying agent or a train engineer may have irremediable consequences; the employee himself will have no chance to recognize and rectify his mistake, nor will other government personnel have an opportunity to intervene before the harm occurs.

*Id.* (emphasis in original).

In *Skinner*, the plaintiffs did not dispute that the railroad employees covered by the drug testing program were engaged in safety-sensitive tasks. In this case, plaintiffs only concede that five of the positions covered by the TA's drug testing program are safety-sensitive: train operator, bus operator, tower operator, train conductor and conductor-flagman. Inattentiveness by workers with those five titles clearly can result directly in serious harm to either the public or other workmen. The Court finds, based on the evidence presented at trial, that several other positions also entail safety-sensitive tasks and that many others do not, as follows.

a. Stations and Revenue Departments

Employees in the Stations and Revenue Departments include the booth clerks, who sell tokens; the cleaners, who are responsible for cleaning and maintaining the station and track walls; the collection agents; the turnstile maintainers; and the stockhandlers. The evidence reveals that the booth clerks, cleaners and the collection agents are in safety-sensitive positions. Booth clerks are charged with the responsibility of reporting all emergency situations in the station via a special communications line to the TA command center. Tr. at 2458. In addition, when a human being or debris falls on to the trackbed, the booth clerk must immediately contact the trainmaster and then cut power on the third

rail. Crime in the subways is an everyday occurrence about which booth clerks are expected to be vigilant. Furthermore in recent years, derelicts and defenseless homeless people have taken to living in the stations. New York City subway stations present bizarre and unpredictable dangers to the public and a booth clerk alert to such developments enhances directly the public's safety.

The cleaners are in safety-sensitive positions because they perform the duties of a clerk during the clerk's break, Tr. at 2466, and because they must drive the mobile wash unit trucks. Tr. at 541. Like a gun, a motor vehicle on a public motorway can instantly become a deadly instrument if misused.

The collection agents are in safety-sensitive positions for the simple reason that they carry guns and must be prepared to make life or death decisions. *See Von Raab*, 109 S.Ct. at 1388, 1393. Although the collection agents rarely if ever use their fire arms, the fact that they are entrusted with deadly force and authorized to use that force in the presence of others renders their position safety-sensitive. *Id.* at 1392 (surpassing safety interest in those required to "carry" firearms); *see also Caruso v. Ward*, 72 N.Y.2d 432, 534 N.Y.S.2d 142, 147, 530 N.E.2d 850 (1988); *but see Hartness v. Bush*, 712 F.Supp. 986, 992 (D.D.C.1989) (testing employees who carry firearms but who rarely use them may be "found to be overkill").

Employees with other titles in the Stations and Revenue Departments are certainly not in risk free positions. Turnstile maintainers and stockhandlers must operate equipment with care. However, the evidence shows that an error on the part of these other personnel would have no direct effect on the safety of either the public or other workmen. *Harmon v. Thornburgh*, 878 F.2d at 491.

### b. Car Equipment Department

Trains and small forklifts operated by the Car Equipment Department neither carry members of the public, operate in the midst of the public nor threaten seriously the safety of other workers. Painters and certain cleaners in the Car Equipment Department lack even an attenuated connection to safety.

There is an indirect connection between public safety and the repairs done by many Car Equipment personnel. Based on the evidence, however, that connection does not rise to the level of safety-sensitivity because a mistake by a Car Equipment worker will not have the direct and immediate disastrous consequences required by *Harmon v. Thornburgh, supra.* Uncontroverted testimony shows that after employees have completed repairs and before the repaired train is put back into usage, a different employee or team of employees re-inspects the train. Tr. 466–67. In addition, Car Equipment laborers work under the scrutiny of supervisors, forepersons, and co-workers. After repairs on a particularly critical part like the air brake and certain electrical systems, the train is actually turned on and tested by a team of workers before the train is exposed to public use again.

The road car inspector is the one Car Equipment Department position in which a connection between a mistake and public safety is not attenuated. The road car inspector is the only repair-person who performs his duties outside the repair barns and shops. He works

> in the system where the trains are running. His job is he's on there on call anytime there's a call from the motorman or trainmaster or dispatcher that there's some problems with a train in service.... He probably has more responsibilities than any other maintainer.

Tr. 499–500. This emergency repairperson/inspector has to make on the spot decisions about the proper way to fix a train, which is in service and possibly filled with passengers. The adequacy of the road car inspector's service directly affects the safety of the public. His or her work is necessarily immediately subject to neither supervision, testing nor re-inspection. Frequently it is not until later in the day that a supervisor will evaluate the road inspector's decisions. As a result of the direct

effect of a road car inspector's work on the public, the position is safety-sensitive.

### c. Track Division

The Track Division of the Track and Structures Department contains track walkers, track workers, track equipment maintainers, chauffeur-specialists, crane operators, railroad track cleaners and power distribution maintainers.

The track walkers inspect all of the tracks "for defects such as broken rail, improper gauging, cracks, base wear," Tr. 2375, as well as "lose spikes, [and] rail joints." Tr. 571. The track walker performs these inspections on his own with only spot checks by a supervisor. After inspecting miles of track, the walker writes a report and the necessary repairs are made in response to the report. The track walker's ability to make an accurate report is critical to the safety of the subway tracks. The evidence shows that if a track walker leaves a defect out of his report, there is little chance that the defect will be noticed until either the occurrence of an accident or the next time the tracks are inspected. Since a track walker's report is important to the safety of the transport system and not necessarily double-checked by another employee, the track walker position is safety-sensitive.

Track workers are the ones who actually fix the track. The work is performed exclusively in groups. Tr. at 2374. In addition to the co-workers, there also usually is a foreperson overseeing a track worker's performance. Due to the degree of supervision of his or her work by co-workers and forepersons, the track worker is not a safety-sensitive title.

Track equipment maintainers are mechanics who repair the various tools used by the track maintenance crew. They work on their own and their repair work is not inspected and observed to the extent of a repair-person working in the Car Equipment Department's repair station. Often they go out alone and repair machines in the tracks and then return. The equipment they work on is often potentially dangerous equipment like chainsaws and a tamping machine—a powerful device that lifts the railroad ties. The safety of other TA workers depends upon a track equipment maintainer's care and in light of the minimal supervision over this position, it is found to be safety-sensitive.

A track cleaner cleans out debris from the track area. They work in groups and their work is checked by a foreperson. The track cleaners have a role in the safety of the subway. They help prevent fires and dispose of infectious waste. Nevertheless, track cleaners are not in a safety-sensitive position because their work is checked and there is only an indirect connection between a negligent cleaning job and disastrous consequences.

The power distribution maintainers are responsible for maintaining the electrified third rail. They always work either in a group or with a foreperson. Although the job sounds dangerous, the evidence shows no relation between the attentiveness of a power distribution maintainer and the safety of others. The only ramification of negligent power distribution is that the worker may hurt himself or not repair the third rail efficiently and the foreperson's supervision should prevent such occurrences. The evidence reveals nothing about a potential public danger for which the power distribution maintainer could be responsible. Accordingly, these well-supervised employees are not in safety-sensitive positions.[6]

The chauffeur specialist and crane operator are responsible for driving and operating "cranes, cherry pickers, bulldozers and tractor trailers." Tr. at 2382. Testimony reveals that these large and powerful vehicles are often operated at street level and in the presence of others. Motor vehicles in public can instantly become a deadly instrument if misused and therefore these operators are found to be in safety-sensitive positions.

---

**6.** The power distribution maintainer of the Track and Structures Department is different from the Electrical Department's power maintainer, whom the evidence shows is in a safety-sensitive position. *See infra.*

#### d. Structure Division and Line Equipment Division

The Structure Division of the Track and Structures Department contains carpenters, masons, iron workers, tinsmiths, plumbers, sign painters, general painters and maintainers of heating and air conditioning. The Line Equipment Division of the Track and Structures Department contains maintainers of lighting, elevators, escalators, ventilation and hydraulic systems. The work of these divisions is done either in groups or in a shop environment. There is also "on-site supervision." Tr. 2387. Evidence reveals that these workers are essential to the smooth operation of the subway system and that negligence on their part can be part of a chain of events which ends in injury. However, there is only evidence that a lapse of attention by one category of workers in these divisions could lead directly to a disastrous consequence. That category is the workers charged with maintaining the TA's heating plants. The heating units are complex and the pressure must be checked hourly. If a worker does not check the high pressure heating plant properly an explosion, endangering the public and other workers, can result. Accordingly, the Structure and Line Equipment Divisions do not contain safety-sensitive positions, except for those workers charged with checking and maintaining the heating plant.

#### e. Electrical Power Department

The Electrical Power Department is primarily responsible for supplying the 600 volts of electricity in the third rail. All members of this department working directly with the power lines do not work alone and are supervised at a ratio of approximately eleven workers to one supervisor. The repairs are subject to testing, inspection or the approval of a foreperson.

However, certain acts may result in disasters despite the safeguards of supervision and testing. When removing a high voltage circuit breaker to conduct routine maintenance, the power maintainer must be able to judge exactly when the circuit breaker is in a proper condition for removal or else an explosion can result. The Superintendent of Electrical Power testified that there are also other occasions when a power maintainer's misjudgment could cause an explosion. The various workers directly involved with maintenance of the power, as opposed to those supervisors in administrative positions, are in safety-sensitive positions because of the imminence of a dangerous explosion if they make a mistake.

The Signals Division is also within the Electrical Department. The signal equipment constitutes "the traffic lights of the subway system." Tr. 2491. This system is critical to the safe operation of the subways. It not only notifies train operators of when they must stop and slow down, but it actually causes trains to brake automatically to prevent accidents. Signal maintainers and their helpers repair, test and maintain the signal equipment. They work in pairs and the quality of their work is only spot-checked or checked weekly by a maintenance supervisor. If a signal maintainer does not notice a problem with a signal then it appears likely that it can go undetected until an accident occurs. It is especially important that the worker maintain the complex "fail-safe mode" of the signal system, which causes a "stop" signal whenever any of the electrical circuits malfunction. In addition, the helper provides "basic flagging protection" by telling the maintainer when a train is coming. Tr. 2494. The deputy supervisor and other superintendents are responsible for assessing the information produced by a computer system and then allocating the maintenance workers to different track areas. In sum, the Signals Division is responsible for a delicate aspect of the subway system which is integral to the system's safety. The different positions each constitute a safeguard against signal failure. The improper performance of any of these tasks could lead to signal problems which is the direct cause of many train accidents. Although the number of safeguards and the degree of supervision is admirable, there is little immediate double-checking of performance. Accordingly, the jobs in this division are all safety-sensitive.

The final subdivision of the Electrical Department is the Communications Division. The Communications Division's telephone maintainers, electronic maintainers and helpers are responsible for installing, repairing and maintaining the various alarm, public address and emergency communication systems located throughout the transit system. Other transit employees, such as booth clerks, and passengers depend upon these systems for safety from violent crime. Often repair work is done in the field, rather than in the shop. Although the electronic maintainers work primarily in the shop they also must go out to the subway cars to install new radios. When repair work is done in the field, the only way a supervisor can know whether many of the repairs or maintenance have been completed improperly is by receiving a complaint that a communications apparatus is operating in a faulty manner.

Due to the importance of the communications equipment to the safety of the transit system and the lack of supervision in the field, the telephone maintainers, electronic maintainers, and their helpers are in safety-sensitive positions. Telephone maintainer also is a safety-sensitive title because it entails driving trucks. Tr. 2278. However, the power electronic maintainers are not included because they work in a supervised laboratory environment where all equipment is tested before it leaves.

### f. Surface Department

The Surface Department operates and maintains the buses. The Department consists of dispatchers, supervisors, Group A bus maintainers, Group B bus maintainers, cleaners, maintainers' helpers, Group C mechanical maintainers, and bus operators—which has already been stipulated to be a safety-sensitive job title.

Cleaners have various custodial duties. Crew dispatchers assign bus operators their work. Yard dispatchers assign the operator to a specific bus. None of those jobs entail safety-senstive tasks.

The repair work performed by the bus maintenance staff is essential to the safety of the buses. However, evidence shows that the repair system operates in a manner which prevents a momentary lapse of attention from directly causing disastrous consequences. After all maintenance work has been done, the bus must be inspected by a foreperson. The repair work is further checked by a road test after major repairs. Finally, the bus operator conducts a safety test at the beginning of each shift.

The conduct of the road test is the only maintenance duty which rises to the level of safety-sensitive. There was testimony that road tests have been conducted on highways and in populated areas. The operation of a bus on these motorways, even though there are no passengers, directly puts the safety of members of the public at risk and therefore all maintainers whose position entails road tests have safety-sensitive jobs.[7]

The quality control dispatcher is another Surface Department employee with a safety-sensitive job. This position entails checking that certain essential features of the bus, such as lights, are operating. If the quality control dispatcher overlooks an essential safety feature, then the public will be exposed to a dangerous bus. Accordingly, it is a safety-sensitive position.

### g. Rapid Transit Operations

Plaintiffs have stipulated that the train conductors, train operators and motor operators of Rapid Transit Operations are in safety-sensitive positions. The motor instructor, however, is not in a safety-sensitive position. His duty of surveying and then evaluating train crew performance is a safety-related task; but a mistake on his part lacks the direct and immediate conse-

---

7. The evidence is unclear as to exactly which members of the Surface Department may be required to drive buses in public. The Court finds that all positions which require or may require the employee, at any point in time, to drive a bus in public are safety-sensitive. There is also evidence that various maintenance and stockroom personnel in the Surface Department occasionally use forklifts to move some materials. Negligent forklift operation could hamper the maintenance operations and cause damage, but the forklift operation is not a safety-sensitive task. There was no evidence that the forklift is utilized in close proximity to other employees or that its misuse would constitute an imminent danger to others.

quences of a safety-sensitive position, like that of the worker actually operating the train.

In sum, based on the evidence presented at trial, the following positions are found to be safety-sensitive: train operators, bus operators, train conductors, conductor-flagmen, and tower operators; the Station and Revenue Department's booth clerks, station cleaners and collection agents; the Car Equipment Department's road car inspectors; the Track Division's track walkers, track equipment maintainers, chauffeur specialists, and crane operators; the Structure and Line Equipment Divisions' heating plant workers; the Electrical Power Department's workers directly involved with maintenance of the power; the Signals Division's employees; the Communications Divisions' telephone maintainers, electronic maintainers and helpers; and the Surface Department's quality control dispatchers and employees who drive buses in public.

### 3. Weighing the Individual and Government Interests

■ The TA possesses a "special need" to take urine from those employees in safety-sensitive positions. *Skinner,* 109 S.Ct. at 1414. This "special need" to conduct a search outweighs the private interests in having the protection of a warrant. Accordingly, it did not violate the Fourth Amendment for the TA to fail to obtain a warrant before taking urine from employees in safety-sensitive positions and applicants for safety-sensitive positions.

A more delicate balancing of government and private interests is necessary to resolve whether a warrant is required before the TA may take urine in relation to non-safety-sensitive positions. Although the TA did not have a "special need" to search these employees, the Fourth Amendment does not entirely negate the legitimacy of the TA's interest in disciplining employees with non-safety-sensitive jobs who have engaged in unlawful drug use prior to or at work. *Von Raab,* 109 S.Ct. at 1398 (Scalia, J. dissenting). The TA's interest in taking

urine from transit workers in non-safety-sensitive positions did not rise to the level of a "special need," but it rose to the level of a legitimate interest connected to the efficient operation of the workplace.

In *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 1500–01, 94 L.Ed.2d 714 (1987), and *United States v. Collins,* 349 F.2d 863 (2d Cir.1965), cert. denied, 383 U.S. 960, 86 S.Ct. 1228, 16 L.Ed.2d 303 (1966), warrantless searches by public employers of employees' possessions were upheld because of recognition of the government's "work-related purpose," 107 S.Ct. at 1500, and an employer's need "to supervise and investigate the performance of" its employees. 349 F.2d at 868.)[8] *Ortega* and *Collins* are not directly on point because the searches were of an employee's property located in public and in work areas, where an individual's interests are less significant than in this case in which the TA is searching one's body. Allowing the TA to dispense with the warrant requirement is also made difficult because of the deficiencies of the TA's notice procedures. However, requiring a warrant before a "work-related," as opposed to a law enforcement-related, search is a substantial burden on the government. Moreover, the individual liberty interests at stake in a work-related urine taking, although significant, are less than those at stake when criminal law enforcement is at issue. Since the TA conducted its urine testing for a work-related purpose and in a manner that was not subject to unbridled discretion, the Court finds that the TA's interest in taking urine from a non-safety-sensitive employee outweighed those private interests which would require a warrant requirement. Accordingly, the TA did not violate the Fourth Amendment by refraining from obtaining a warrant before taking urine from employees in non-safety-sensitive positions.

### B. Determining the Appropriate Objective Standards for the Search Conducted

The next stage in this Fourth Amendment inquiry is to determine whether the

---

**8.** Although *Collins* involved a Customs Service employee, the government's interest in conducting the search had no relation to the sensitive nature of that job, which played such a key role in *Von Raab's* Fourth Amendment analysis of the search of Customs Service employees.

proper standard was followed in the decision to conduct the search.

> In making this determination, the reasonableness test 'requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against "an objective standard," whether this be probable cause or a less stringent test.'

*Security and Law Enforcement Employees v. Carey*, 737 F.2d 187, 203–04 (2d Cir.1984) (quoting *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)). Courts have applied three standards to determine the reasonableness of a search: (1) probable cause, (2) reasonable suspicion, also known as " 'some quantum of individualized suspicion,' " *Skinner*, 109 S.Ct. at 1417 (quoting *United States v. Martinez–Fuerte*, 428 U.S. 543, 560, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976)); *Terry v. Ohio*, 392 U.S. 1, 21 & n. 18, 88 S.Ct. 1868, 1879 & n. 18, 20 L.Ed.2d 889 (1968); *Carey*, 737 F.2d at 204–205 (reasonable suspicion standard); *see also Von Raab*, 109 S.Ct. at 1393 ("founded suspicion" is less than probable cause), and (3) reasonable in the absence of reasonable, individualized suspicion, or what this Opinion will call "bare reasonableness." *See Skinner*, 109 S.Ct. at 1417 (applying reasonableness standard without an individualized suspicion requirement) and *Von Raab* 109 S.Ct. at 1392 (same).

■ The standard chosen for this Fourth Amendment analysis is based on the standard applied by courts when analogous private and government interests have been at stake. *See Carey*, 737 F.2d at 204. In *Von Raab* and *Skinner*, the Supreme Court weighed the government-employer interest in preventing drug use in safety-sensitive positions against the intrusion upon personal privacy by a taking of urine. Accordingly, it is proper to apply the same bare reasonableness standard utilized in *Von Raab* and *Skinner*, to determine whether the TA acted in a constitutional manner when taking urine in relation to safety-sensitive positions.

■ The taking of urine in relation to non-safety-sensitive positions requires a higher standard. The *Von Raab* and *Skinner* opinions emphasize the serious intrusion entailed by "requir[ing] employees to perform an excretory function traditionally shielded by great privacy." *Skinner*, 109 S.Ct. at 1418. " 'There are few activities in our society more personal or private than the passing of urine.' " *Skinner*, 109 S.Ct. at 1413 (quoting *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 175 (5th Cir.1987), aff'd in part and vacated in part, —— U.S. ——, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989)).[9]

When safety-sensitive work is not at issue, then an individual's expectations that such privacy will not be infringed is higher than was the case in *Skinner* and *Von Raab*. *Skinner*, 109 S.Ct. at 1418 (safety-sensitivity of position diminishes employees' expectations of privacy); *Von Raab*, 109 S.Ct. at 1394. Just as the absence of safety-sensitivity increases the privacy interests, it also reduces the government's interests by eliminating the presence of a "special need." Accordingly, when safety-sensitive work is not involved, the balance of private and government interests mandates a standard higher than bare reasonableness to satisfy the Fourth Amendment.

---

**9.** The TA's taking of urine for purposes of detecting sugar and protein health problems, which occurs as part of all regular physical examinations, is not at issue in this case and has never been subject to Fourth Amendment scrutiny. The TA's taking of urine at a separate time for a drug test is substantially different in scope, purpose and consequence from a taking of urine for protein and sugar testing. *See Skinner*, 109 S.Ct. at 1412 ("[t]he ensuing chemical analysis of the sample ... is a *further* invasion of the tested employee's privacy interests" (emphasis added)); *cf. Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 1152, 94 L.Ed.2d 347 (1987) (new and distinct search occurs each time a policeman views an unexposed portion of stereo equipment); *United States v. Chadwick*, 433 U.S. 1, 13, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977) (search of contents of footlocker is an "additional and greater" intrusion than *seizure* of footlocker). The chemical analysis for the presence of marijuana metabolites makes the takings of urine at issue in this case an invasion of privacy distinct from earlier health-related urine takings. Past urine tests for protein and sugar did not diminish the expectations of privacy concerning a taking of urine for drug testing.

The highest standard is probable cause. The probable cause standard " 'is peculiarly related to criminal investigations,' " where significant losses of liberty are at stake. *Von Raab*, 109 S.Ct. at 1391 (citations omitted). The evidence shows that enforcement of the criminal code is not a goal of the TA's drug testing program. The TA's primary goal is its understandable interest in ensuring its workforce is free from the inefficiencies caused by use of the unlawful drug, marijuana. Since the search is pursuant to a legitimate, prophylactic, work-related measure, probable cause is too high a standard. *Von Raab*, 109 S.Ct. at 1392.

The Supreme Court has described "individualized suspicion" as the minimum standard "usually" applied when special government needs are absent. *Skinner*, 109 S.Ct. at 1417; *New Jersey v. T.L.O.*, 469 U.S. 325, 342 n. 8, 105 S.Ct. 733, 743 n. 8, 83 L.Ed.2d 720 (1985). The Second Circuit has applied this standard in its Fourth Amendment scrutiny of strip searches of corrections officers. *Carey*, 737 F.2d at 204–05. Although taking of urine may be deemed slightly less intrusive than a strip search, the state prison authorities conducting the searches in *Carey* possessed special safety interests, which were entitled to deference by the court and which diminished the expectations of privacy of the corrections officers. *Id.* at 205. Thus, *Carey* is a sufficiently analogous balance of government and private interests.

The Court is also persuaded by the application of the reasonable suspicion standard by two district courts scrutinizing urine testing of federal employees in non-sensitive positions. *See National Treasury Employees Union v. Lyng*, 706 F.Supp. 934, 949–50 (D.D.C.1988) (Department of Agriculture employees with non-sensitive jobs); *Bangert v. Hodel*, 705 F.Supp. 643, 645, 650–51 (D.D.C.1989) (Interior Department employees with non-sensitive jobs); *see also Hartness*, 712 F.Supp. at 992 (*Lyng* and *Bangert v. Hodel* are "entitled to great respect" after *Skinner* and *Von Raab*). Accordingly, the individualized suspicion standard, also referred to as the reasonable suspicion standard, is the appropriate standard for assessing the constitutionality of the taking of urine from TA employees in non-safety-sensitive positions.

C. Application of the Reasonable, Individualized Suspicion Standard to the Taking of Urine in relation to Non–Safety–Sensitive Positions

The individualized suspicion standard requires the TA to be able to justify taking urine for a drug test by

'point[ing] to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience.' Inchoate, unspecified suspicions do not meet this definition.

*Carey*, 737 F.2d at 205 (quoting *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir.1982)). *See also Hartness*, 712 F.Supp. at 993 ("reasonable, articulable, and individualized suspicion of use of drugs on-duty or off-duty causing a reasonable suspicion that a specific employee may be under the influence of drugs while on-duty"); *Bangert v. Hodel*, 705 F.Supp. at 650 (approving limited list of concrete, objective factors from the definition of "reasonable suspicion" promulgated in the drug testing plan of the Department of Interior). Reasonable suspicion "must be directed to a specific person." *Carey*, 737 F.2d at 205; *see also Bangert v. Hodel*, 705 F.Supp. at 653 (suspicion under the Fourth Amendment is "personal" and "suspicion of entire classes ... [is] abhorrent to the American Constitution"). Courts have only found evidence of generalized drug use amongst a group to be pertinent to a Fourth Amendment inquiry when the positions are safety-sensitive. *See Skinner*, 109 S.Ct. at 1407–08, 1419; *Jones v. McKenzie*, 833 F.2d 335, 340 (D.C.Cir.1987), vacated sub nom., *Jenkins v. Jones*, —— U.S. ——, 109 S.Ct. 1633, 104 L.Ed.2d 149 aff'd and amended, 878 F.2d 1476 (D.C.Cir.1989) (per curiam); *Hartness*, 712 F.Supp. at 990–92.

The TA argues that its testing satisfies a reasonable suspicion standard based upon nationwide statistics of drug use and the evidence that there are drug users on the TA workforce. While these contentions might raise a *generalized* suspicion,

they are insufficient to satisfy a reasonable or individualized suspicion standard. Courts have flatly rejected the nationwide drug use argument as inadequate to constitute reasonable suspicion of an individual under the Fourth Amendment. *See, e.g., Bangert v. Hodel,* 705 F.Supp. at 653 & n. 36 (citing *Lyng,* 706 F.Supp. at 945 n. 40; *Harmon v. Meese,* 690 F.Supp. 65, 68 (D.D. C.1988) [, aff'd sub nom., *Harmon v. Thornburgh,* 878 F.2d 484 (D.D.C.1989), cert. denied sub nom., *Bell v. Thornburgh,* — U.S. —, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990) ]; *Hansen v. Turnage,* No. 88–30261, slip op. at 9, 1988 WL 147881 (N.D. Cal. July 28, 1988) ("evidence of a nationwide drug problem cannot be generalized to subject innocent and hardworking federal employees to urinalysis")).

The "drug use amongst the workforce" argument might conceivably be enough to satisfy an individualized suspicion standard if there were, in the TA workforce, "strong evidence of a veritable 'drug culture'." *Jones v. McKenzie,* 833 F.2d at 340. The evidence shows that in the years 1984 through 1986, approximately two percent of the employees and six percent of the applicants tested positive solely for marijuana. Only a "small number" tested positive for marijuana and other drugs. Ex. 106 at 41, ¶ 22. These statistics are insufficient to impute a reasonable suspicion of marijuana use to either all workers or all applicants.

Drug testing related to non-safety-sensitive positions can only satisfy the reasonable suspicion standard, if the circumstances which the TA considered sufficient to trigger marijuana testing did, in fact, constitute grounds for reasonable suspicion. The TA has brought forth no evidence to show that three of the four occasions upon which plaintiffs were tested for marijuana use are grounds for suspecting drug use: an employee's return to work after an extended absence or suspension, an applica-

tion for a promotion or to become a TA employee, and a periodic physical.[10]

A more detailed examination is necessary to determine whether reasonable suspicion is satisfied by testing after an on-duty incident or accident. The TA defines an incident as "any unusual occurrence such an accident, altercation, passenger's complaint, or the observation of bizarre behavior." Ex. 106 at 40, ¶ 15. An accident is "any unforeseeable event that results in injury to a person, vehicle or property." *Id.*

It is reasonable to suspect that an employee impaired as the result of using marijuana may have been the cause of an incident or accident. Ideally, TA authorities would resort to drug tests to determine whether marijuana use was the incident's cause only after having conducted a lengthy investigation which reveals a reasonable suspicion that certain employees were using drugs and caused the incident. However, whether impairment from marijuana use was a possible cause can only be verified if a drug test is conducted shortly after the accident or incident, because the drug metabolites may not remain in the body for a long period and can be reduced by passing urine. Therefore, it is reasonable to conduct marijuana testing of all employees who might have been the cause of the incident or accident shortly after the event has occurred. In light of the circumstances, a reasonable suspicion of drug use arises from the rational inference of a causal connection between an employee's impairment and an incident or accident.

The only reservation the Court has about the constitutionality of post-incident testing is the vagueness of the terminology. Evidence, however, does not show that the TA has exploited the definition of "incident" in order to justify arbitrary drug testing. *See Dent v. New York City Transit Authority, supra.* In hindsight, certain drug tests may not have been necessary because the employee actually bore no responsibili-

---

10. Except for yard and crew dispatchers, it appears that all of the titles subject to urinalysis upon the occasion of a periodic physical are in the safety-sensitive category and subject to a lower standard than reasonable suspicion.

Plaintiffs do not challenge testing in circumstances after a positive test or when a supervisor suspects drug impairment. Thus the Court need not decide whether those circumstances constitute reasonable suspicion.

ty for the incident. However, the record does not show that at the time of the testing the TA did not have a reasonable suspicion that there may have been a causal connection between the incident and drug use by the employee subjected to testing. Only one knowing in advance the outcome of an investigation into the cause of the incident could make a more rational determination of whether a reasonable suspicion of drug use exists. In connection with the proceedings on remedies, to be hereinafter scheduled, the Court will consider proposals for a more limited set of circumstances raising a reasonable suspicion of marijuana use, which would be a more precise way of assuring that there are no aberrations from compliance with Fourth Amendment standards for testing those in non-safety-sensitive positions. *See, e.g., Bangert v. Hodel,* 705 F.Supp. at 650–51 (rejecting "open-ended 'among other things' clause" in list of circumstances which constitute reasonable suspicion). In sum, the marijuana testing related to non-safety-sensitive job titles fails to meet the appropriate Fourth Amendment standard of reasonable suspicion, except when the test is conducted after an incident or accident.

Even though the post-incident testing is after circumstances which create a reasonable suspicion, such testing still may violate the Fourth Amendment if "significant safeguards" do not accompany the urinalyses. *Bangert v. Hodel,* 705 F.Supp. at 650. If the search—even when conducted upon reasonable suspicion—does not satisfy the standards of minimal intrusiveness, enunciated and discussed in the next section, then the private interests may outweigh the government interests.

D. Application of the 'Bare Reasonableness' Standard

The degree of Fourth Amendment scrutiny appropriate for testing related to safety-sensitive tasks is set forth in *Von Raab* and *Skinner.* The Supreme Court examined urinalyses conducted when there were no grounds for individualized suspicion in *Von Raab* and urinalyses conducted after an accident, which may have given rise to

an individualized suspicion, in *Skinner.* Since the standard of scrutiny was "bare reasonableness," the presence of individualized suspicion as a predicate to the testing in *Skinner* was irrelevant to the holding. As Judge Oberdorfer has observed, *Skinner* and *Von Raab* both only required a "substantial *generalized* suspicion" of drug use among workers as a condition precedent to testing when surpassing safety interests were at stake. *Hartness,* 712 F.Supp. at 991. In this case, the Court takes notice of the high levels of marijuana use in New York City and the nation, Tr. at 1651, 1672, 2651; as well as the results of the tests (positive results were received by two per cent of employees and six per cent of applicants) and concludes that there is grounds for a generalized suspicion that there are marijuana users among TA workers and applicants. *See Von Raab,* 109 S.Ct. at 1395 ("little reason to believe that American workplaces are immune from this pervasive social problem"); *but see, id.* at 1400 (Scalia, J., dissenting) (condition precedent to testing must be "well demonstrated evils *in that field,* with well known or well demonstrated consequences").

Satisfaction of the "bare reasonableness" standard, as applied in *Skinner* and *Von Raab,* also requires minimal interference with privacy interests so that the government's interest in safety outweighs the privacy interests. Determining the results of that balance is difficult in this case because in several significant respects the TA has interfered with expectations of privacy to a greater extent than did the government in *Skinner* and *Von Raab.*

The first privacy factor is notice of the test. *Von Raab,* 109 S.Ct. at 1394 n. 2, 1396 n. 4. There was evidence that a number of employees were not on notice that they would be subject to marijuana testing by urinalysis. *Compare* Tr. 34, 124, 191, 258, 336, 364–68 (notified of laboratory testing of urine, but scope of the test unspecified); Ex. 106 at 34, ¶ 8(e); Ex. 107 at 47–50, *with Skinner,* 109 S.Ct. at 1415 (occasions when drug testing urinalysis will occur "doubtless are well known to covered employees"); *Von Raab,* 109 S.Ct. at 1391

("every employee" is aware of the drug testing procedures). TA employees are from a full range of educational and cultural backgrounds and the TA should have adjusted its notice procedures to assure that all employees comprehended not only that urine would be taken for analysis, but also that it would be tested specifically for marijuana, as well as other drugs whose mere possession constitutes criminality. An inexpensive vehicle for providing such notice would have been to precede each taking of urine with the individual receiving an oral explanation and signing a consent form, stating in plain English, and in other languages if necessary: that the urine would be tested for marijuana; that there is possibility of a false positive; what the possible consequences of a positive result are; and what means are available for challenging the veracity of a positive result.

Another difference is that the searches were not conducted in a professional, medical environment which exhibits respect for the individual's dignity. "[P]ersonnel unrelated to the railroad employer" collected the samples in *Skinner.* 109 S.Ct. at 1418. That was not the case in the TA program. Moreover, the TA refrained from utilizing the less intrusive, yet inexpensive techniques employed by the federal government in *Skinner* and *Von Raab* in which the monitor did not have to observe directly the act of urination. *Skinner,* 109 S.Ct. at 1418; *Von Raab,* 109 S.Ct. at 1394 n. 2; *see also Skinner,* 109 S.Ct. at 1428 (Marshall, J., dissenting). There was also evidence that in TA testing in 1984 and 1985 there was often neither a urinal for overflow nor running water for washing.

Furthermore, the TA's governmental interest in taking urine is diminished because the legitimate end of the tests—detecting only drug users—may not have been met because the tests did not produce results of undisputed validity. As the second part of the Opinion finds, the practices of the TA and the laboratory did not result in an indisputably accurate indication that the individual was a drug user. Thus, the government's interest in taking urine here is less than in *Skinner* and *Von Raab,* where the government's interest in taking the urine was enhanced because the ensuing (EMIT plus GC/MS) tests were stipulated as producing highly accurate results. *Von Raab,* 109 S.Ct. at 1394 n. 2.[11]

Precedent is unclear on what effect these aberrations from the factual circumstances present in *Skinner* and *Von Raab* should have on the evaluation of the reasonableness of the search. The D.C.Circuit recently observed that the use of the Supreme Court drug testing cases as a tool for determining whether the balance of private and government interests satisfies the Fourth Amendment "presents a delicate task." *Harmon,* 878 F.2d at 488.

> The [Supreme] Court did not ... indicate whether it deemed the case [*Von Raab*] a close one, in the sense that minor variations in the facts would have tipped the balance in the other direction. Nor did it indicate which (if any) of the relevant factors would be *essential* to a constitutional testing plan.

*Id.* at 488–89 (emphasis in original).

■ A close reading of the Supreme Court cases persuades the Court that the balance as to safety-sensitive tasks tips in favor of the government. Not only does safety-sensitivity create a special need for the government, but the safety-sensitivity of a task also diminishes the workers' and applicants' expectations of privacy. Since

---

**11.** The Supreme Court cited the following passage from the Fifth Circuit opinion below in *Von Raab:*

> While the initial screening test, EMIT, may have too high a rate of false-positive results for the presence of drugs, the union does not dispute the evidence that the follow-up test, GC/MS is almost always accurate, assuming proper storage, handling, and measurement techniques.

*Von Raab,* 816 F.2d at 181 (cited in *Von Raab,* 109 S.Ct. at 1394 n. 2). As will be explained in Part II, the types of drug tests used here are the enzyme multiplied immunoassay technique (EMIT) and the bonded phase absorption with thin layer chromatography procedure (BPA/TLC). Experts agree that the gas chromatography/mass spectrometry (GC/MS) test used in *Skinner* and *Von Raab* is more reliable than either EMIT or BPA/TLC. Ex. 106 at 64–65, ¶¶ 113, 116, 118; Tr. 2189, 2218–19, 2559–60.

safety is the overwhelming factor in both the government and privacy portion of the balance, the Court finds that the balance tips in favor of the government when safety-sensitive tasks are at issue. However, the Court notes that the Fourth Amendment jurisprudence on drug testing is still evolving and it would be a wise precaution for the TA to avoid departures from the "minimal invasiveness" of *Skinner* and *Von Raab* in the future.

■ The Court also must determine whether "bare reasonableness" was satisfied with regard to the procedures for taking urine samples from non-safety-sensitive employees upon reasonable suspicion—i.e., post-incident testing of non-safety-sensitive employees. The procedural infringements upon the privacy expectations outlined above are more serious in the case of non-safety-sensitive workers because the safety factor is not present. In light of this absence of a surpassing safety interest, the infringement on private interests are more serious than the government interests at stake. The evidence presented at trial does not show that any members of the class received exceptional treatment which complied with the intrusiveness factors of *Skinner* and *Von Raab*. Accordingly, the Court finds that the TA's procedures for taking of urine from non-safety-sensitive employees after an incident violated the Fourth Amendment.

Although post-incident testing satisfied the reasonable suspicion standard, the procedures followed by the TA did not satisfy "bare reasonableness" and therefore violated the Fourth Amendment. The TA's procedures for obtaining test samples with respect to safety-sensitive tasks are upheld as constitutional under the "bare reasonableness" standard.

### E. State Constitutional Claim

Plaintiffs argue that the search and seizure clause of the New York State Constitution, Article I, § 12, is more stringent than the equivalent clause in the Fourth Amendment. Although that may be true in certain contexts, a survey of the leading New York cases reveals that the federal

and state search and seizure analyses of urine taking for the purpose of drug testing are the same.

In the seminal case of *Patchogue–Medford Teachers Congress v. Board of Education*, 70 N.Y.2d 57, 517 N.Y.S.2d 456, 510 N.E.2d 325 (1987), the New York Court of Appeals scrutinized the process of taking urine from school teachers for drug tests. At the outset, the court noted with regret that there were few federal cases directly on point at that time. *Id.* 517 N.Y.S.2d at 459–60, 510 N.E.2d at 327–28. The court then held that the taking of urine is a search and that the government could dispense with the warrant and probable cause requirements. *Id.* at 460–61, 510 N.E.2d at 329–30. Then the opinion determined that the proper standard was reasonable suspicion. Urine testing not only had to satisfy the reasonable suspicion standard, but it also could only take place when "safeguards are provided to insure that the individual's reasonable expectation of privacy is not subjected to unregulated discretion." *Id.* at 462, 510 N.E.2d at 331. Citing *O'Connor v. Ortega, supra,* and *Delaware v. Prouse, supra,* the New York court arrived at its standard of review by balancing the infringement on individual interests of taking urine against the state's "legitimate interest in seeing that its employees are physically fit and that their performance is not impaired by illegal drug usage." *Id.* at 462, 510 N.E.2d at 331. *Patchogue* sets forth a model for reviewing non-safety-sensitive positions which is identical to the federal model applied above. Indeed, in *Fiorenza v. Gunn*, 140 A.D.2d 295, 527 N.Y.S.2d 806, 809 (2d Dept.1988), the appellate division applied that model when scrutinizing the urinalysis of a TA worker with a non-safety-sensitive job under the federal and state search and seizure clauses.

In the year following *Patchogue*, the New York Court of Appeals ruled on the constitutionality of a urine testing program for the Organized Crime Control Bureau (OCCB) of the New York City Police Department. *Caruso v. Ward*, 72 N.Y.2d 432, 534 N.Y.S.2d 142, 530 N.E.2d 850 (1988). The decision relied upon several federal

circuit and Supreme Court cases without drawing any distinctions between Fourth Amendment and Article I, § 12 jurisprudence. The court noted that the privacy interests and government interests in this case were substantially different than those in *Patchogue* because of the sensitivity of the officers' tasks. The court described

> the potentially fatal risks to fellow officers and others if a drug abusing OCCB officer is called upon to use a weapon while under the influence of drugs in inherently high-risk assignments.

*Id.* 534 N.Y.S.2d at 147, 530 N.E.2d at 855. Accordingly, the Court held that the reasonable suspicion standard was inappropriate and that the taking of urine would be upheld as reasonable as long as the program was conducted in a manner in which the government interests outweighed the infringements upon the privacy expectations of the workers. *Caruso* sets forth the same model as *Skinner* and *Von Raab* for evaluating searches when special needs like safety-senstivity are at stake. Indeed, three New York courts recently applied the test set forth in *Caruso, Skinner* and *Von Raab* to uphold the taking of urine from public employees with safety-sensitive job titles. *See Seelig v. Koehler,* 76 N.Y.2d 87, 556 N.Y.S.2d 832, 556 N.E.2d 125 (1990) (corrections officers); *Barretto v. City of New York,* 555 N.Y.S.2d 382 (App.Div. 2d Dept.1990) (TA detective assigned to Joint Terrorist Task Force); *Dent v. New York City Transit Authority, supra* (subway conductor). Accordingly, the conclusions as to the constitutionality of the TA's taking of urine under the federal search and seizure clause are identical when New York State constitutional principles are applied.

## II. *Due Process*

Plaintiffs allege that, once urine samples were taken from them, the TA's procedures for determining whether they used marijuana violated the due process clauses of the Fourteenth Amendment of the United States Constitution and of Article I, § 6 of the New York State Constitution.

### A. Due Process Interests

The threshold to a claim of a due process violation, under both federal and state law, is the possession by the plaintiff of an interest in life, liberty or property. Only after such an interest has been identified can the Court proceed to decide what procedures are required before a government entity such as the TA can take away the due process interest. *See Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Plaintiffs argue that liberty and property interests of applicants, probationary employees and permanent employees were at stake in the drug testing procedures.

#### 1. *Liberty Interests*

Courts recognize a liberty interest in being free from stigmatization by government disciplinary action. *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Roth,* 408 U.S. at 573, 92 S.Ct. at 2707; *Lentlie v. Egan,* 61 N.Y.2d 874, 474 N.Y.S.2d 467, 462 N.E.2d 1185 (1984). To reach the level of a liberty interest, the stigma must occur "in the course" of termination or discipline, *Paul v. Davis,* 424 U.S. 693, 710, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976), and "call into question the person's 'good name, reputation, honor, or integrity'" to the extent that either the person's standing in the community is damaged or job opportunities are foreclosed. *Brandt v. Board of Cooperative Educational Services,* 820 F.2d 41, 43–44 (2d Cir.1987) (quoting *Roth,* 408 U.S. at 573, 92 S.Ct. at 2707). Moreover, for a deprivation of his liberty interest, the plaintiff must "raise the issue," but need "not prove," that the grounds for the stigmatizing disciplinary action is a falsity. *Id.* at 43 (explaining *Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977) (per curiam)). Finally, the plaintiff must show that there is a likelihood that the stigma will be publicly disclosed. *Bishop,* 426 U.S. at 348–49, 96 S.Ct. at 2079–80.

■ Applying these rules to plaintiffs' claims here is not difficult: the charge of illegal drug use both lowers one's standing

in the community and forecloses employment opportunities, *Wisconsin v. Constantineau,* 400 U.S. 433, 434–36, 91 S.Ct. 507, 508–10, 27 L.Ed.2d 515 (1971) (charge of alcohol abuse); *Jones v. McKenzie,* 628 F.Supp. 1500, 1508 (D.D.C.1986), rev'd in part on other grounds and vacated in part on other grounds, 833 F.2d 335 (D.C.Cir. 1987), vacated sub nom., *Jenkins v. Jones,* — U.S. ——, 109 S.Ct. 1633, 104 L.Ed.2d 149 aff'd and amended, 878 F.2d 1476 (D.C. Cir.1989) (per curiam); the defamation occurred "in the course" of termination or suspension, because the charges were placed in the file during the course of the disciplinary activities, *see Brandt,* 820 F.2d at 45 (explaining "in the course" requirement of *Paul v. Davis, supra* ); and the class has raised the issue that the results of the drug tests may have been erroneous. Likelihood of public disclosure is the only condition precedent to recognition of a liberty interest which remains to be satisfied.

In *Brandt,* the Second Circuit held that the likelihood of public disclosure requirement has been satisfied when an individual "would not be 'as free as before to seek another' job." 820 F.2d at 45 (quoting *Bishop v. Wood,* 426 U.S. at 348, 96 S.Ct. at 2079). Such likelihood of public disclosure can result "when the stigmatizing charges are placed in the discharged employee's personnel file and are likely to be disclosed to prospective employers." 820 F.2d at 45. The evidence shows that the files of permanent employees, probationary employees and applicants routinely contain references to the drug test results. Ex. 106 at 66, ¶ 122; Tr. at 2428. The record also reveals that the TA had an established policy against release of that stigmatizing information. Such a policy, however, may not be sufficient. The Second Circuit has held that even in the presence of a nondisclosure policy, there still may be a likelihood of disclosure if the record shows that plaintiff, upon applying for jobs in the future, would have to grant prospective employers authorization to view his or her files. *Brandt,* 820 F.2d at 45.

The record in this case does not establish that there is much likelihood that a former TA employee or applicant will be required by a prospective employer to provide a grant of authorization for a direct viewing of TA files. The evidence does establish, however, that some subsequent employers ask applicants to explain truthfully the reasons for any suspensions or terminations. Tr. at 100, 211; *see also* Ex. 59 (New York City Department of Personnel Form). The necessity of revealing the stigmatizing contents of one's TA files on future job applications meets the test in *Brandt* of "not being as free as before to seek another job" and therefore satisfies the likelihood of public disclosure condition. One's liberty interest is affected by acts which interfere with one's ability to seek and obtain employment from the employer of one's choice. Although one could lie or dissemble in job applications, it would not be consonant with public policy to base this Court's decision on behavior that should not be encouraged. In addition, a direct refusal to answer would lead many employers to an adverse conclusion about a prospective employee.

This finding of likelihood of public disclosure only applies to permanent TA employees. There is no evidence that future employers—other than the TA—require explanations by applicants of the basis for either a denied TA application or an unsuccessful TA probationary period. In addition, testimony reveals that the TA releases the files of applicants and probationary employees only when subject to a court subpoena. Tr. at 2424. Most importantly, TA policy is to refrain from even informing applicants and probationary employees of the specific reasons for their dismissal. Rejected applicants and unsuccessful probationary employees would be unable even to explain the grounds for their rejections and thus would not be required to lie or to dissemble about those grounds.[12]

---

12. Plaintiffs also argue that the "public disclosure" condition is satisfied based upon testimony that many co-workers somehow learned of the drug test results. This argument lends some support to the finding of a liberty interest on behalf of the permanent employees, but it does not affect the probationary employees and applicants. Evidence showed that a permanent

Accordingly, the marijuana test results only foreclosed the future job opportunities of permanent employees and only that subclass had a liberty interest in reputation at stake in the TA's marijuana testing procedure.[13]

## 2. Property Interests

 A due process interest in property is created when a statute mandates that a deprivation take place only in the presence of a limited set of circumstances. *See Kentucky Department of Corrections v. Thompson,* —— U.S. ——, 109 S.Ct. 1904, 1909, 104 L.Ed.2d 506 (1989) (substantive limitations on official discretion create due process interests); *Perry v. Sinderman,* 408 U.S. 593, 599–602, 92 S.Ct. 2694, 2698–2700, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth,* 408 U.S. at 577–78, 92 S.Ct. at 2709–10. The TA's permanent employees possessed a due process interest in being free from removal or discipline by virtue of the entitlement created in New York Civil Service Law § 75(1) which provides that they

> shall not be removed or otherwise subjected to any disciplinary penalty provided in this section except for incompetency or misconduct shown after a hearing upon stated charges pursuant to this section.

That statute creates a due process interest because of the induced expectation that one will not be subjected to discipline unless there has been a finding of either incompetency or misconduct. *See Board of Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 2417–22, 96 L.Ed.2d 303 (1987); *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 538–39, 105 S.Ct. 1487, 1491–92, 84 L.Ed.2d 494 (1985) (procedural due process scrutiny of hearing provided by Ohio statute for civil servants contesting dismissal). By clear implication, the hearing required by the statute must be a fair hearing. Procedural safeguards are necessary to assure that the TA disciplines employees only in the event of either incompetency or misconduct. Moreover, the procedures which the Constitution requires before deprivation of the property interest created by that statute are not limited to the hearing provided for by the statute. *See Loudermill,* 470 U.S. at 540–42, 105 S.Ct. at 1492–93 (procedural requirements of Constitution are not diminished by the fact that State specified its own procedures when creating the property interest).

There are no similar government-created entitlements to job security which constitute due process interests on behalf of the probationary employees or the applicants. Thus this Court will only decide to what procedures permanent employees were constitutionally entitled before the TA could remove or discipline them for drug use.[14]

---

employee's co-workers often figure out what had happened on that employee's drug test. Sometimes the employee himself is the source of this information. However, an application rejection or unsuccessful probationary period is not so uncommon that others are able to infer that the rejected applicant or probationary employee must have tested positive for drug use. Also, evidence that a few people, who did not even know an individual, overheard his or her drug test results is insufficient to support a finding of a public disclosure which damaged that individual's standing in the community. *See, e.g., Lentlie v. Egan,* 474 N.Y.S.2d at 468, 462 N.E.2d at 1186.

Plaintiffs have not claimed that the denial of an application or the unsuccessfulness of a probationary period, without reference to the drug testing results, constitutes stigmatizing information.

**13.** *Brandt v. Board of Cooperative Educational Services,* 845 F.2d 416 (2d Cir.1988) (*Brandt II*) held that when the stigmatizing information has been expunged from the file and there is no showing that the information was released during the pre-expungement period then there was no public disclosure. *Brandt II* is inapplicable to this case where the information will remain in the files indefinitely.

**14.** The evidence shows that plaintiff Thomas Burka was a permanent employee at the time of his positive drug test. The parties have stipulated that Mr. Burka was hired by the TA in 1981 as a cashier. Ex. 106 at 9, ¶ 1(a). "In September 1984, he was offered and accepted a position as a car cleaner, and he became a probationary employee in that position." *Id.* "In December 1984, Mr. Burka was notified that a trackworker position, for which had applied in early 1984 was available." *Id.* at 10, ¶ 1(c). In connection with the approval of his application for the trackworker position, Mr. Burka's urine was taken for marijuana testing on January 7, 1985. *Id.* When Mr. Burka's test result was positive, not only did the TA deny his re-

## B. 'What Process Is Due'

### 1. *The Due Process Standard*

Under *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and its progeny, the constitutional adequacy of procedures is determined by considering the private interests, the government interests, and the risk of error. The private interests of a permanent employee in his or her reputation, future job opportunities, and lost wages (due to suspension or termination) are weighty. *See, e.g., Loudermill,* 470 U.S. at 543, 105 S.Ct. at 1494. The government has a legitimate interest in its attempts to create a work place where there are no drug impaired workers. This interest assumes a greater importance because drug impaired TA workers could cause serious threats to public safety. *See supra* Part I. However, the TA also has a strong interest in preserving its labor force by refraining from suspending and terminating those workers who are not drug users. *Loudermill,* 470 U.S. at 544, 105 S.Ct. at 1494 ("the employer shares the employee's interest in avoiding disruption and erroneous decisions"). The private interest and government interest prongs of the *Mathews v. Eldridge* test require pro-

cedural safeguards that go to great lengths to assure the integrity of the process of determining whether one is a drug user, as long as those lengths do not infringe upon the ability of the TA to maintain a drug free work place.

The third factor to be considered, as required by the *Mathews v. Eldridge* test, is the risk of the procedures producing an erroneous result. In order to consider this factor, it is helpful to review the procedures utilized by the TA for determining whether a permanent employee is a drug user. From October 1984 to April 1987, the TA determined whether a permanent employee was a drug user by taking a urine sample, having it transported to and evaluated by the Division for Substance Abuse Services Laboratory (DSAS) and then, upon receipt of a positive test result, conducting a hearing at the employee's request. The DSAS would issue a report of a positive result after marijuana metabolites had been detected in two enzyme multiplied immunoassay technique (EMIT) tests and in a confirmation test based upon a bonded phase absorption with thin layer chromatography (BPA/TLC) procedure.[15]

quest to transfer to the trackworker position and dismiss him from his probationary position as car cleaner, but the TA also terminated him from all employment.

At the time of the drug test, Mr. Burka was a permanent TA employee with approximately four years tenure with the agency. Before his drug test, Mr. Burka was never dismissed and had never resigned from his employment with the TA. He was in a probationary *position* as car cleaner, but was not a probationary TA employee; he was an applicant to transfer to the position of trackworker, but was not a person submitting an application to work for the TA. Simply transferring to a different job title or applying to transfer to a different position with the same employer does not eliminate an individual's status as a permanent employee of the TA.

Plaintiff Frank Doe was in a similar position to Mr. Burka and the TA treated him as a permanent employee. Mr. Doe was tested in connection with his application to transfer to a different position with the TA and received a positive result while he was still in his first weeks at the new position. At the time of the testing, Mr. Doe had three years tenure as a TA employee. The TA has stipulated that Mr. Doe had a permanent employee's "right to challenge the drug use charge" in a Section 75 proceeding.

*See* Ex. 106 at 15–16, ¶¶ 3(a), (b), (h), (i), (*l*) and (m). Accordingly, Mr. Burka and Mr. Doe each had the due process interests of a permanent employee at stake in the TA's drug testing program.

**15.** Prior to utilizing DSAS, the TA used the Laboratory for Chromatography (the LFC). As discussed in the introduction, the TA has settled the due process claims of those tested by the LFC (the LFC subclass) in a consent order dated February 1, 1990. Even though the plaintiff class contends that it has only settled the "accuracy of testing" portion of the due process claims of the LFC subclass, the entire due process claim of the LFC subclass was rendered moot by the consent order. If a process is unconstitutional because an inherently inaccurate test result is relied upon, then there is no need to evaluate the other aspects of the process. A due process violation is based upon an evaluation of the totality of the procedures utilized before the government deprives one of life, liberty or property. Even if other aspects of the TA's procedures independently violated the due process rights of the LFC subclass, a finding of such violations would be redundant. No additional recovery is available because two aspects of a process, rather than just one, independently

The manufacturer of the EMIT test produced data in 1984 concluding that the test was 99 percent accurate. Ex. FH. That accuracy figure was derived from tests of 50 to 100 "quality-control samples," half of which were free of marijuana metabolites and half of which had marijuana metabolites added to them. Ex. FH. However, there was information produced after 1984 which showed that for certain individuals the likelihood of a false positive was significantly higher than the 99 percent figure reveals.

The record shows that the ingestion of certain lawful drugs or herbs causes false positives in both the EMIT and BPA/TLC tests. The parties have stipulated that, in February 1986, the manufacturer of EMIT announced that three commonly used, legal, anti-inflammatory drugs—ibuprofen (found in Advil, Nuprin and Motrin), fenoprofen (found in Nalfon) and naproxen— "create positive [EMIT] results in samples where no marijuana metabolite exits." Ex. 106 at 53, ¶ 71; Tr. 954. *See also* Tr. 968 (expert testimony on "significant potential" of anti-inflammatory drugs to cause false positive on EMIT test). The EMIT test had been in use for several years before this cross-reactivity was detected. *See* Ex. FH (September 1984 report of EMIT manufacturer states that there has been no observed interference due to cross-reactivity). The DSAS modified its EMIT test in 1985 to prevent anti-inflammatory drugs from causing false positives; however, due to the fact that EMIT test results are based on enzyme reactions, there remained a "potential exist[ing] for a similar" undetected cross-reactivity. Tr. 959. In addition, the evidence shows that the presence of metabolites produced by many legal herbs can interfere with the accuracy of the BPA/TLC confirmation test. Tr. 1021–22, 1992–93, 2040–42. Consequently, both the manufacturer of EMIT and the TA's experts recommended that the EMIT test be confirmed by the gas chromatography/mass spectrometry (GC/MS) technique, which does not produce results based on enzyme reactions and therefore is rendered the process violative of due process

not subject to the cross-reactivity problems of the EMIT test. Ex. FH; Ex. 106 at 64–65, ¶ 113–18; Tr. 934–45, 2189. Under the series of tests utilized by the DSAS, it is a "logical conclusion" that a person who had recently ingested substances which cross-react with the EMIT and BPA/TLC tests "might get an overall false positive." Tr. 2203 (TA drug testing expert, Dr. Edward Cone).

Cross-reactivity is not the only factor not included in the 99 percent accuracy figure. There is evidence that the rate of error was further compounded because innocent mistakes often were made by those being tested. TA employees come from all walks of life. Many are young and relatively carefree. English is not the first language of many TA workers and many have educations unrelated to chemistry or science. Consequently, multiple opportunities existed for misunderstandings in the communication of instructions for providing urine and of the necessity for care and cleanliness. For example, one plaintiff testified to dropping a vial into a puddle of fluid in a urinal before urinating into that vial. Two other plaintiffs testified that they urinated into an unclean pitcher, which was supposed to have been used only for overflow, and then poured the result into the vial, into which they were supposed to urinate directly. In none of these cases did the plaintiff request a new vial or a clean pitcher.

The rate of error was also augmented by the numerous opportunities for TA and DSAS personnel to confuse one vial or test tube of urine with another as a result of either innocent mishandling by somebody with access to the samples or by erroneous record keeping. Tr. at 1788–93 (Mr. Dennis Jukofsky, TA witness and DSAS scientist, pointing out weaknesses of DSAS safeguards); Tr. 903–04, 911, 1433–34, 1438–39, 1586, 2208, 2263–64, 2266, and Ex. 106 at 52, ¶ 68 (potential for sequencing and other mix-up problems due to inadequate safeguards at DSAS); Ex. 106 at ¶ 66 (lack of use of chain of custody forms); Tr. 1198 (samples not stored by TA in standards.

locked containers until late 1986), Tr. 1353 (until July 1987 the DSAS laboratory had no security guard, log book or formal provision for restricting access), Tr. 1360, 1467–68, 1780–81, 1787–88, 1859–61 (DSAS often leaves samples on carts in unlocked areas for long periods before testing completed). In addition, an evaluation report of DSAS conducted in June 1986 by the TA's drug testing expert, Dr. Robert Willette, criticized DSAS because the BPA/TLC confirmation procedure was "insufficient," Ex. 81 at 11; the "quality control was minimal and could be easily strengthened," *Id.* at 16–17; and there was a "lack of strong sequencing control." *Id.* at 33.

### 2. Applying the Due Process Standard

#### a. Reliance of the TA on the Drug Test Results in Determining Whether an Employee Is a Drug User

Although evidence was presented that DSAS reports on occasion were of questionable accuracy, the Court does not find the accuracy of the drug tests to have been so unreliable as to render it violative of due process to have used the drug test reports in the determination of whether the worker was a drug user. This finding is in accordance with cases upholding the admissibility in legal proceedings of the results of scientific tests which are neither foolproof nor patently unreliable. *See Peranzo v. Coughlin,* 608 F.Supp. 1504, 1508 (S.D.N.Y.1985) (comparing cases admitting results of breathalyzer test, oil sample matching test, and neutron activation analysis, despite the fact that those tests are not foolproof; with cases refusing to admit results of psychological stress evaluation, polygraph test, and hair analysis, because those tests are unreliable); *Sowa v. Looney,* 23 N.Y.2d 329, 296 N.Y.S.2d 760, 764–65, 244 N.E.2d 243, 245–46 (N.Y. 1968) (polygraph test which is not "reliable in the abstract" should not have been con-

sidered in decision to dismiss police officer); *see also Peranzo v. Coughlin,* 675 F.Supp. 102, 105 (S.D.N.Y.1987) (it does not violate prisoner's due process rights to admit a drug test result of 98+% accuracy as evidence in prison disciplinary hearings), aff'd, 850 F.2d 125 (2d Cir.1988);[16] *cf. Manson v. Braithwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (in state criminal trial, due process did not permit jury to consider eyewitness evidence which is patently unreliable, but did permit jury to consider eyewitness evidence which is of "questionable" veracity). Scientific evidence of questionable validity is admissible as long as there are adequate procedures available for challenging the test results. *See Peranzo,* 675 F.Supp. at 105 (percentage of error on test results compensated for by procedures allowing prisoners to present defenses and rebuttal evidence) (citing *Spence v. Farrier,* 807 F.2d 753 (8th Cir.1986)); *see also Watkins v. Sowder,* 449 U.S. 341, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981) (trial procedures may compensate for any due process infringement caused by jury's exposure to unreliable evidence during suppression hearing). Thus, the TA's use of DSAS drug test results satisfied procedural due process if post-urinalysis procedures provided workers with means for identifying false positive results. *Loudermill,* 470 U.S. at 543, 105 S.Ct. at 1494 (when "dismissals for cause ... involve factual disputes," procedural due process requires that employee have a meaningful opportunity to challenge accuracy of facts); *Green v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959) (due process requires "opportunity to show that it [the factual basis for government's decision to deprive one of employment] is untrue"); *Joint Anti–Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 171–172, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring) ("No better instrument has been devised for arriving at the truth than

---

16. Although Judge Sand's *Peranzo* opinion provides guidance as to principles of due process, the determination of the level of procedural safeguards required in a prisoner's rights case does not govern this case. The private and government interests, which determine the amount of safeguards required by due process, are substantially different in this case. The interests of a law-abiding citizen in continued employment are at stake here, as opposed to interests of a convict in a prison, where more intrusion into private interests is required. *See Superintendent v. Hill,* 472 U.S. 445, 454–55, 105 S.Ct. 2768, 2773–74, 86 L.Ed.2d 356 (1985).

to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it.").

### b. Post–Urinalysis Procedures

The TA notified permanent employees of the results of their urine tests at least a week after the taking of urine. If DSAS reported a positive result, based upon two EMIT tests and a BPA/TLC confirmation test, then the TA provided a series of grievance procedures for all permanent employees to contest the reported results. The culmination of those procedures was what the TA calls a "Trial Board Review," which is a hearing pursuant to New York Civil Service Law § 75. The hearings were held in accordance with the following procedures mandated by Section 75:

> A person against whom removal or other disciplinary action is proposed shall have written notice thereof and of the reasons therefor, shall be furnished a copy of the charges preferred against him and shall be allowed at least eight days for answering the same. The hearing upon such charges shall be held by the officer or body having the power to remove the person against whom such charges are preferred, or by a deputy or other person designated by such officer or body in writing for that purpose. In case a deputy or other person is so designated, he shall, for the purpose of such hearing, be vested with all the powers of such officer or body and shall make a record of such hearing which shall, with his recommendations, be referred to such officer or body for review and decision. The person or persons holding such hearing shall, upon the request of the person against whom charges are preferred, permit him to be represented by counsel, or by a representative of a recognized or certified employee organization, and shall allow him to summon witnesses in his behalf. The burden of proving incompetency or misconduct shall be upon the person alleging the same. Compliance with technical rules of evidence shall not be required.

N.Y. Civil Service Law § 75(2). The statute provides for written notice of the charges and the reasons therefor, an opportunity to respond to the charges in writing, a record of the hearing, the right to be heard by counsel or union representative, and the right to present witnesses. In addition caselaw provides for "the concomitant opportunity to cross-examine witnesses," a record of the proceedings and a decision based solely on the record. *Simpson v. Wolansky,* 38 N.Y.2d 391, 380 N.Y.S.2d 630, 634–35, 343 N.E.2d 274, 277–78 (1975).

The safeguards offered by Section 75 would satisfy due process standards in many situations. However, the requirements of procedural due process vary from case to case. *See Loudermill,* 470 U.S. at 542, 105 S.Ct. at 1493 (due process clause requires implementation of procedures "appropriate to the nature of the case") (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)); *Goss v. Lopez,* 419 U.S. 565, 578, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975) (" 'nature of due process negates any concept of inflexible procedures universally applicable' ") (quoting *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961)); *Armstrong v. Manzo,* 380 U.S. 545, 550–52, 85 S.Ct. 1187, 1190–91, 14 L.Ed.2d 62 (1965) (procedures must be meaningful "under all the circumstances" of particular case); *Economico v. Village of Pelham,* 50 N.Y.2d 120, 428 N.Y.S.2d 213, 215, 405 N.E.2d 694, 696 (1980) ("unlike some legal principles, the requirements of due process do not command that an inflexibly ordained procedure be applied in every case in which some right or status recognized by State law is threatened.... each case turns on an independent analysis").

There are two ways that the workers could have challenged the validity of DSAS test result reports under Section 75: (1) by presenting exculpatory evidence indicating a flaw in the drug testing procedures or a flaw in the testing itself, and (2) by presenting evidence extraneous to the drug test, which showed that the employee was not a drug user. The Court finds that,

despite the safeguards provided by Section 75, the refutation of a DSAS report of a positive test result by either method was a virtually impossible task.

The first method required in most instances a showing that a mistake was made inside the DSAS laboratory either in procedures or in testing. At trial, there was testimony to the extensive possibilities for the occurrence of various technical mistakes and negligent quality control, as well as problems with the chain of custody, security, and sequence control. But evidence that there were mistakes was inferential and generalized. Even with the protections of cross-examination and the opportunity to call witnesses, a TA employee could not, as a practical matter, have demonstrated at a Section 75 hearing that his or her particular test report was the result of a mishap at DSAS. Under the second approach, certain employees could have attempted to support denials of drug use with credible explanations of why their test was positive: for example, passive inhalation or intake of a legal drug or herb. For most accused employees, however, the only extrinsic evidence was their own denial, which would most likely be insufficient in the face of a DSAS report.

The difficulty of meaningfully challenging a drug test report in a Section 75 hearing was compounded by the TA's decision to utilize a substantial evidence standard of proof.[17] Tr. 2419. *See Santosky v.*

*Kramer,* 455 U.S. 745, 755, 102 S.Ct. 1388, 1395, 71 L.Ed.2d 599 (1982) (standard of proof is element of whether procedures satisfy due process). Under the substantial evidence standard utilized by the TA, an accusation of misconduct would be upheld even though "a similar quantum of evidence was available to support other varying conclusions." *Collins v. Codd,* 38 N.Y.2d 269, 379 N.Y.S.2d 733, 734, 342 N.E.2d 524, 525 (1976); *see also Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (substantial evidence is " 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion' ") (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)); *State Division of Human Rights v. Columbia University,* 39 N.Y.2d 612, 385 N.Y.S.2d 19, 21, 350 N.E.2d 396, 397 (1976), cert. denied sub nom., *Gilinsky v. Columbia University,* 429 U.S. 1096, 97 S.Ct. 1112, 51 L.Ed.2d 543 (1977). The evidence at trial shows that in the hearings all the TA had to do to meet its burden of substantial evidence, regardless of the credibility of an employee's denial of drug use, was submit the drug test results without supporting the test result with any additional evidence, such as the primary data material from which the result was derived.[18] A DSAS report was not so unreliable as to be inadmissible; however, the possibility of error and the private interests at stake were so significant that the TA should not

17. Section 75 itself is silent as to the standard of proof which the TA must meet in order to satisfy its burden. The TA argues that it must utilize a substantial evidence standard under Article 3 of the New York State Administrative Procedure Act (SAPA), which sets forth rules to govern agency "adjudicatory proceedings." *See* SAPA § 306(1). However, Article 3's substantial evidence standard for "adjudicatory proceedings" does not apply to a Section 75 hearing because SAPA excludes "employee disciplinary action before an agency" from the term "adjudicatory proceeding." SAPA § 102(3). Moreover, on at least two occasions, the New York courts have designated the slightly higher, preponderance of the evidence standard as appropriate for Section 75 hearings. *See Foran v. Murphy,* 73 Misc.2d 486, 342 N.Y.S.2d 4, 8 (N.Y.Sup.Ct. 1973); *Antinore v. State of New York,* 79 Misc.2d 8, 356 N.Y.S.2d 794, 799 (N.Y.Sup.Ct. 1974) ("preponderance of the evidence standard

..., despite a ... statutory silence, ... governed § 75 (Civ.Serv.Law) hearings by virtue of cogent decisional law") (citing *Foran, supra* ), rev'd on other grounds, 49 A.D.2d 6, 371 N.Y.S.2d 213 (4th Dept.1975), aff'd, 40 N.Y.2d 921, 389 N.Y.S.2d 576, 358 N.E.2d 268 (1976).

18. The EMIT instrument detects the presence of marijuana metabolites by recording the reaction speed of a special enzyme mixture with a specimen. The BPA/TLC procedure requires the treatment of a specimen on a glass plate so that colored spots appear to reveal marijuana metabolites. The significant primary data materials are the EMIT tapes, indicating the level of marijuana metabolites in the sample and in the calibrator or standard positive sample, as well as the BPA/TLC treated plates, indicating the presence of marijuana in the sample and the positive standard.

have deprived permanent employees of property and liberty interests when those employees were able to present equally credible evidence in their defense.

Although the Section 75 proceeding did not provide a meaningful opportunity to challenge a test result, a court can only find a violation of due process if there were alternative procedures available which were meaningful, pragmatic and not so costly as to impede the legitimate purpose of the government's action. *See Mathews v. Eldridge,* ("At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost."); *Goss v. Lopez,* 419 U.S. at 578, 583, 95 S.Ct. at 738, 740 (due process requires "practical" procedures). The evidence shows that there were practical means available to the TA for providing employees with both meaningful notice of the results and an opportunity to challenge DSAS test reports.

The Section 75 hearing could have been a forum for a meaningful hearing if the TA had instituted comprehensive procedures for informing employees at the time of the urine taking of the possibility of a positive final test result, through the implementation of preliminary testing on-site. Such notice would have warned employees that they should have another sample taken by an independent laboratory or doctor. Plaintiff's drug testing expert, Dr. Robert V. Blanke, explains that an independent urine test taken less than a day after the original test "would have [had] significant, even crucial probative value," even though it is conceivable that the level of marijuana metabolites might have diminished over a short period so that the independent sample would not have produced a "positive" result. Blanke Aff. ¶ 15. An independent

sample would have been significant because "[m]odern toxicological techniques" indicate exactly what type and level of metabolites are present. *Id.* Thus, if the original sample contained a sufficiently high level of marijuana metabolites to produce a positive result, then the independent sample, if it did not produce a "positive" result, might either show no level of marijuana metabolites present or a level adequate to confirm the veracity of the original positive test result.

The TA failed to provide notice sufficient to warn employees that they should have independent tests performed if they believed that they had not used marijuana. Even if such notice had been provided, TA employees cannot have been expected to undertake the rather substantial expense of a private urinalysis every time urine was taken from them by the TA. Moreover, most employees testified that they believed that if they did not use marijuana then there was no reason to fear an incorrect test result. The TA employees generally appeared to have been ignorant that a plethora of mishaps could occur between the time when one gives the TA a sample and the time that a report arrives from the DSAS.[19]

The TA only informed workers of positive test results at least a week after the sample had been provided. There is evidence that some employees sought independent tests after hearing of their positive result reports; however, those independent tests conducted on samples taken a week later were of little exculpatory value. Since marijuana metabolites do not remain in the system for more than 24 to 48 hours in some people,[20] the TA hearing officers correctly determined that an independent test conducted a week later presented no grounds for challenging the DSAS report.

---

**19.** There also is some evidence that the TA failed to develop adequate notice procedures to inform employees that their urine would be specifically tested for marijuana. *See* Tr. 34, 124, 191, 258, 336, 364–68; Ex. 107 at 47–50, Ex. 106 at 34, ¶ 8(e). Thus, employees could not have been expected to anticipate the need to undergo independent tests before receiving notice of a positive result.

**20.** "Usually" only 50% of marijuana metabolites are excreted in the first 72 hours following ingestion, however, this figure can vary depending on the amount of urination and the individual. Ex. FH.

There is evidence that the TA could have provided immediate notice that the urine sample just provided was likely to test positive. All parties have stipulated that a portable, inexpensive urinalysis kit, called EMIT-st, "was (and remains) capable of providing a virtually instantaneous indication of whether a urine sample contains the metabolites of marijuana." Stip. ¶ 2 (May 9, 1990). According to the TA's drug testing expert, Dr. Robert Willette, the Syva Company conducts a three day training course for operators of the on-site test and then continues to monitor the operators. Willette Aff. ¶ 12. The Court finds that the TA could have set up an on-site EMIT-st test with minimal administrative burden and the end result would have been that the employees could meaningfully challenge a DSAS report with an independent test report. Those independent tests would not only make the Section 75 hearings meaningful, but also would enhance the overall accuracy of the drug testing program.

The TA points to several drawbacks of the EMIT-st test. None of these problems, however, detract from its feasibility as a vehicle for meaningful notification of the likelihood of a positive result. Experts agree that the EMIT-st test is not of sufficient reliability to support a final determination and should be confirmed by subsequent tests in a laboratory. "[I]ts accuracy [is] said to be from 95 to excess of 98% effective." Freidus Aff. ¶ 17 (May 17, 1990). Therefore the TA's expert concludes that on-site testing is not practical because a false positive on a EMIT-st would cause unnecessary damage to one's " 'reputation and peace of mind' " during the period between notice of the on-site test result and the final laboratory report. Willette Aff. ¶ 18(3) (quoting Federal Railroad Administration's Final Rule on Random Drug Testing). Such problems could be resolved by the TA's keeping the EMIT-st result confidential and by the worker having the opportunity for a timely independent test. The mental anxiety of receiving an unchallengeable final report is certainly far worse than any burden on an employee caused by immediate notice that there is a likelihood of a positive final report *and* that there is still something that can be done to challenge the veracity of that final report.[21]

The on-site testing procedure is not necessarily the only way that the TA could have complied with the due process requirement of providing meaningful notice and opportunity to challenge the government decision to deprive one of liberty and property. The implementation of a different item of procedural protection may well have afforded good reason for eliminating the need for the on-site testing process. *See* Friendly, " 'Some Kind of Hearing'," 123 U.Pa.L.Rev. 1267, 1279 (1975). A process which provides the employee with specific notice of the possible consequences of a positive test result, with a right of access to the original sample, and with notice of that right also may be sufficient, under certain circumstances, to provide a meaningful opportunity to challenge the drug test report. *Schaill v. Tippecanoe County School Corp.*, 864 F.2d 1309, 1323–24 (7th Cir.1989); *Banks v. F.A.A.*, 687 F.2d 92, 94–96 (5th Cir.1982).

The parties have stipulated that "until late 1986, the Transit Authority did not have a procedure whereby employees were informed that they could have their positive samples retested by an independent laboratory or a procedure for retrieving and retesting positive samples." Ex. 106 at 66, ¶ 119. There was testimony by DSAS offi-

---

**21.** The TA also contends that because of the questionable reliability of EMIT-st results, all vials of samples would have had to have been sent on to the laboratory for testing regardless of the EMIT-st results. The TA points out that there would then be a small percentage of samples which produced negative results on the EMIT-st (and therefore the early result would not have served as a grounds for notice), but produced positive results on the final laboratory report. The TA could easily have further diminished this minor problem by providing all those tested immediately with a notice that there is a slight possibility of a false negative on an EMIT-st preliminary test and that independent, quantitative metabolite testing within 24 hours is recommended. No such notice was provided. *See supra* note 19 (failure of TA even to notify employees that urine was being tested for marijuana).

cials that access to the sample was feasible prior to late 1986; however, employees cannot be faulted for failing to arrange for a retest of an original sample when they were neither notified of the availability of re-testing nor notified of the continued existence of the sample. *Cf. California v. Trombetta*, 467 U.S. 479, 490 n. 11, 104 S.Ct. 2528, 2535 n. 11, 81 L.Ed.2d 413 (1984) ("it would be anomalous to permit the State to justify its actions by relying on procedural alternatives that were available, but unknown to defendant").

The parties have further stipulated that "[i]n late 1986, the Transit Authority began informing their employees at the time they provided the urine sample that a portion of the specimen would be available for retesting." [22] Ex. 106 at 66, ¶ 120. The only objection plaintiffs raise to the adequacy of the post-"late 1986" re-testing program is that the DSAS failed to freeze the sample available for re-testing and therefore the re-tested sample would be of little probative value. There is evidence that the samples were left unfrozen before the DSAS conducted its tests; however, the plaintiffs have failed to make any showing that, after the DSAS completed its tests in the period following "late 1986," the sample preserved for re-testing was not adequately preserved. The formal re-testing program, implemented in "late 1986," was sufficient to elevate the drug testing program to a level which satisfies due process standards.[23]

In sum, the findings—as to the risk of error, the weight of the private interests of the accused employees and the weight of the various government interests—require the Court to hold that procedural due process obligated the TA to provide safeguards, which the evidence shows it did not provide until after "late 1986." It is possible that there were and are more efficient alternatives for satisfying due process which have not been addressed here; however, the Court refrains from promulgating a code of administrative procedure for the TA. *See Wheeler v. Montgomery*, 397 U.S. 280, 283, 90 S.Ct. 1026, 1028, 25 L.Ed.2d 307 (1970) (Burger, C.J., dissenting) (Courts should "allow evolutionary procedures at various administrative levels to develop, given their flexibility to make adjustments. This would permit orderly development of procedural solutions, aided as they would be by expert guidance available within" agencies.); *see also* Friendly, *supra*, 123 U.Pa.L.Rev. at 1302–03 ("One can readily imagine how different administrative codes would be as written by each of the twenty-seven judges of the Southern District of New York; much would depend on the luck of the draw.... This process would be painfully lengthy and indirect, and future code amendments from new perceptions or reevaluations would be most difficult to make.").

---

**22.** The parties were unable to establish at trial when in "late 1986" the notice aspect of the re-testing program was implemented. Tr. 1180. The Court will presume the term "late 1986" to mean October 1, 1986, the beginning of the final quarter of 1986 and the earliest reasonable starting date for the term "late 1986."

**23.** Plaintiffs have not made any showing that the utilization of the substantial evidence standard during the post-"late 1986" period rendered the Section 75 hearings inadequate for an independent test result to challenge meaningfully the veracity of a DSAS report. The presentation of the re-test's negative result and the information demonstrating the general "questionable" accuracy of DSAS reports would have been sufficient to rebut the TA's marijuana use charge under a substantial evidence standard.

If the TA had provided a less effective series of procedural safeguards, due process may have required that the TA supplement those safeguards by replacing the substantial evidence standard with the slightly higher "preponderance of the evidence" standard. Under a preponderance standard, the TA would have to meet its burden by proving more than a simple equality of the evidence. The scales would have to tip in favor of the TA based upon the quality and persuasiveness of the evidence. *See, e.g., Nissho–Iwai Co., Ltd. v. M/T Stolt Lion*, 719 F.2d 34, 38 (2d Cir.1983) ("preponderance means ... more probably true than false"); *Larson v. JoAnn Cab Corp.*, 209 F.2d 929 (2d Cir.1954); L. Sand, *et al.*, Modern Federal Jury Instructions ¶ 73.01, at 73–4 (adapting charge from *Sharon v. Time, Inc.*, 83 Civ. 4660 (S.D.N.Y.1985)). However, merely requiring a higher standard of evidence is not enough to satisfy due process if there are not adequate means for the employee to gain access to evidence to support his defense.

### c. New York State Due Process Standards

Plaintiff Fa and plaintiff-intervenor Salazar argue that the due process clause of the New York State Constitution requires the Court to engage in a separate, higher level of due process scrutiny than that required by the federal Constitution. Although comparisons of federal and state holdings in certain limited contexts may support that contention, the Court finds that the parameters of the procedural due process analysis in this case are equivalent for both the state and federal due process clauses. *See Economico v. Village of Pelham*, 50 N.Y.2d 120, 428 N.Y.S.2d 213, 405 N.E.2d 694 (1980).

3. *Scope of Due Process Liability to Employees who Failed to Utilize the Section 75 Procedures Offered by the TA*

■ Some permanent employees who received positive test results pled *nolo contendere* when challenging the DSAS findings or refrained from even invoking the hearing process. The TA is still liable to those plaintiffs for violation of their constitutional rights, because this procedural due process challenge is collateral to the substantive issue of whether or not drug use occurred. The Supreme Court's resolution of an analogous issue of liability in *Mathews v. Eldridge, supra,* requires this Court to hold the TA liable to those permanent employees who failed to utilize the hearings offered by the TA for contesting the charge of drug use since the entire procedure lacked due process before "late 1986."

In *Mathews v. Eldridge,* 424 U.S. at 330–331, 96 S.Ct. at 900–01, the Supreme Court was faced with a procedural due process challenge to welfare denial hearings by a plaintiff who had not exhausted the state procedures for challenging the merits of the government's decision. Justice Powell, writing for the Court, stated that the procedural due process claim was collateral to whether the denial of welfare benefits was substantively a correct decision and therefore the plaintiff's failure to exhaust state procedures afforded him for challenging the substance of the decision had no bearing on the merits of the constitutional pro-

cedural issue. Similarly, a plea of *nolo contendere* or the failure to utilize the hearing procedures offered by the TA has no bearing on the merits of plaintiffs' procedural due process claim.

### C. Mr. Fa's Motion to Amend the Complaint

Plaintiff John Fa raises the additional due process claim, in a post-trial motion to amend the complaint, that he was denied an impartial hearing officer. Although the hearing officers are hired by the TA, there is no evidence that any hearing officer evaluated the evidence and made a record without impartially. In particular, Mr. Fa has not shown that his hearing officer, Judge Daniel Gutman, was not impartial. Testimony shows that Judge Gutman communicated to a TA official after a different, earlier hearing to the effect that the expert witness from the LFC was not a good witness. That communication in no way impinged upon Judge Gutman's integrity as an impartial hearing officer. His acceptance of Mr. Fa's drug test report as sufficient evidence for a finding of misconduct was due to the TA's submission of "proof of chain of custody and explanation of the procedures used to create the findings underlying the report," Ex. 106 at 37, ¶ 8(w), as well as Fa's disciplinary record which indicated "21 cautions." Ex. 49. There is a lack of evidence of any partiality. Accordingly, Mr. Fa's motion to amend the complaint to include an allegation that Judge Gutman was not impartial is denied on the grounds that the evidence at trial shows that such an amendment would be futile.

Mr. Fa also seeks to amend the complaint to assert the claim that the TA violated its own rules in deciding to test Mr. Fa. This is an issue which could have been resolved in a TA hearing and is not properly before the Court in this constitutional challenge. The comments of Justice Stevens, writing for the majority, on a similarly peripheral issue in the procedural due process suit of *Bishop v. Wood,* 426 U.S. at 349–350, 96 S.Ct. at 2079–2080, are applicable:

The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize an exercise of an employee's constitutionally protected rights, we must presume the official action was regular and, if erroneous, can best be protected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect ... personnel decisions.[24]

Accordingly, Mr. Fa's motion to amend the complaint to assert a claim of a violation of a TA rule is also denied.

### D. Mr. Fa's Collateral Estoppel Claim

■ Mr. Fa also contends that the hearing officer should have recognized the collateral estoppel effect of his earlier unemployment hearing. An administrative law judge (ALJ) had held in the unemployment hearing that Mr. Fa was entitled to unemployment benefits because Mr. Fa had not committed the alleged misconduct of using marijuana and was therefore justified in his refusal to participate in a drug counseling program after a positive test result. Ex. 48. Under *Ryan v. New York Telephone Co.*, 62 N.Y.2d 494, 478 N.Y.S.2d 823, 467 N.E.2d 487 (1984), a finding of fact in an administrative proceedings has preclusive effect only (1) when the issues in both proceedings are identical and the issue in the first matter was material and essential to the judgment and (2) when the party opposing preclusion had a full and fair opportunity to litigate the matter in the first proceeding.

The TA does not contest that the ALJ decided the material issue of whether Mr. Fa engaged in the misconduct of using marijuana. The ALJ had to reach this issue in order to decide whether Mr. Fa was justified in his refusal to participate in a drug counseling program and therefore was entitled to unemployment benefits. As the New York Court of Appeals explained in *Ryan*, 478 N.Y.S.2d at 827, 467 N.E.2d at 491, the "critical issue" in an unemployment insurance hearing "was whether Ryan was discharged by reason of misconduct." Section 75 explicitly addresses the identical central issue.

The TA argues against collateral estoppel because (1) the collateral estoppel effect would interfere with New York's statutory procedures for adjudicating the correctness of decisions to discipline employees and (2) the unemployment hearing did not present a full and fair opportunity to be heard.

The TA's first contention rests upon *Hill v. Coca Cola Bottling Co. of New York*, 786 F.2d 550 (2d Cir.1986), where the Second Circuit held that under *Ryan* an unemployment hearing does not have preclusive effect upon fact-finding in a discrimination suit. The Second Circuit recognized that New York has separate administrative procedures for deciding discrimination claims and unemployment insurance matters and that this factor " 'works against the application of collateral estoppel' " from one administrative process to the other. *Id.* at 554 (quoting *Board of Education v. New York State Human Rights Appeal Board*, 106 A.D.2d 364, 482 N.Y.S.2d 495, 497 (2d Dept.1984)). Defendant argues that collateral estoppel is similarly inappropriate in Mr. Fa's situation, because of the difference between an unemployment hearing presided over by an ALJ and a Section 75 proceeding, in which the TA Chairperson ultimately can determine whether the record satisfies the burden of proof.

The Second Circuit did not hold in *Hill* that it is not possible for there to be collat-

---

**24.** For the same reason, Mr. Burka's contention that the TA misapplied its rules, in determining the appropriate penalty in response to the finding that he had been using marijuana, is not a question of constitutional proportions before this Court. The due process clause does not govern a dispute over whether the language of the Transit Operating Procedure Manual, Ex. 54, called for Mr. Burka to be counseled, to be suspended or to be terminated.

eral estoppel based on a decision in a different type of administrative proceeding. Such a holding would have been contrary to *Ryan*. The court in *Hill* refers to the difference between the two administrative proceedings solely to bolster the finding that the unemployment hearing did not fully explore the issues of discrimination. The unemployment hearing did not have to consider the issue of racially provoked misconduct in reaching its decision. *Id.* at 553; *see also Gore v. R.H. Macy & Co., Inc.,* 50 Empl.Prac.Dec. (CCH) ¶ 39,154, 1989 WL 65561 (S.D.N.Y.1989). By contrast, the same degree of weighing of the issue of misconduct was necessary to decide Mr. Fa's unemployment claim as to decide his Section 75 claim. Accordingly, the first argument of the TA against collateral estoppel is without merit.

The TA's second argument is that a full and fair opportunity to litigate the issue of misconduct was not available in the unemployment hearing. The burden rests on the opponent to collateral estoppel to establish the absence of a full and fair opportunity, *Ryan,* 478 N.Y.S.2d at 827, 478 N.E.2d at 491, and the TA has failed to meet its burden. The basis for the TA's contention is that it made the strategic decision that it would not attempt to defend the DSAS drug test report with any evidence other than the bare report. At the unemployment hearing, the TA had ample opportunity to pursue a more aggressive defense. In *Ryan,* the New York court refused to hold that a party did not have a full and fair opportunity when "he freely and knowingly chose" to refrain from appearing with counsel. The evidence shows further that at other proceedings the TA had proved misconduct when pursuing the same strategy of only submitting the DSAS test report. The evidence shows that the TA fully participated in the unemployment proceeding and that the TA simply pursued a strategy which required few resources. Collateral estoppel cannot be barred because that strategy failed when the ALJ found Mr. Fa's earnest denial to be more credible than the bare record of the DSAS test result. *See* Ex. 48. The Court had the opportunity to observe Mr.

Fa testify at this trial and finds that the ALJ's finding based on Mr. Fa's sincere and credible appearance was not an unreasonable one.

The TA's reliance on the commentary on the doctrine of collateral estoppel in the New York Court of Appeals holding in *Staatsburg Water Co. v. Staatsburg Fire Dept.,* 72 N.Y.2d 147, 531 N.Y.S.2d 876, 527 N.E.2d 754 (1988) is also misplaced. The stakes in an unemployment hearing are not so trivial as to bar preclusive effect. *See, e.g., Ryan, supra* (collateral estoppel to finding in unemployment hearing). The TA was aware that the integrity of its disciplinary acts in response to drug test reports was at stake. By contrast, the Public Service Commission ruling in *Staatsburg* was merely "an unsolicited advisory opinion." 531 N.Y.S.2d at 879. Furthermore, there was no doubt that the parties were aware that an ALJ decision in an unemployment hearing is a final decision, as opposed to merely an agency determination subject to future modifications to adapt to policy shifts. *See Allied Chemical v. Niagara Mohawk Power,* 72 N.Y.2d 271, 532 N.Y.S.2d 230, 232, 528 N.E.2d 153, 156 (1988) (citations omitted), cert. denied, —— U.S. ——, 109 S.Ct. 785, 102 L.Ed.2d 777 (1989). Accordingly, Mr. Fa's Section 75 hearing violated the principle of collateral estoppel in addition to the procedural due process violations discussed above.

### Conclusion

From January 1984 through April 1987, defendants took urine from employees with non-safety-sensitive job titles and applicants for non-safety-sensitive job titles, under circumstances which constituted unreasonable searches and violated the Fourth Amendment to the United States Constitution and Article I, § 12 of the New York State Constitution. Defendants also proceeded, from October 1984 through September 30, 1986, to take adverse action against permanent employees whose urine samples tested positive without according those permanent employees procedural due process, thereby violating the Fourteenth Amendment to the United States Constitu-

tion and Article I, § 6 of the New York State Constitution.

The Court makes the following findings as to the claims of the named representatives of the plaintiff class, plaintiff-intervenor James Salazar, and individual plaintiff John Fa:

Thomas Burka, a permanent TA employee in a probationary position in the non-safety-sensitive job title of car cleaner, *see supra* note 12, had urine taken from him on January 7, 1985 for marijuana testing in connection with his application to transfer to the non-safety-sensitive position of track worker. Ex. 106 at 10, ¶ 1(c). The TA violated Mr. Burka's search and seizure rights and deprived Mr. Burka of due process.

Eugene Avent, permanently employed in the safety-sensitive position of train conductor, Ex. 106 at 12, ¶ 2(a), had urine taken from him on November 29, 1984 for marijuana testing without violating his search and seizure rights, but in violation of his due process rights.

Frank Doe, permanently employed in the non-safety-sensitive position of assistant civil engineer, had urine taken from him on March 25, 1985 for marijuana testing in connection with his application for promotion to the non-safety-sensitive position of associate staff analyst. The TA violated Mr. Doe's search and seizure rights and his due process rights.

Tracey Devlin, permanently employed in the safety-sensitive position of electronic maintainer in the Communications Division, Tr. 28, had urine taken from him in December 1984 for marijuana testing without violating his search and seizure rights, but in violation of his due process rights.

Fitzgerald Cumberbatch, permanently employed in the safety-sensitive position of booth clerk, had urine taken from him for marijuana testing on November 27, 1984. Ex. 106 at 20, ¶ 5(c), (d), (g). The TA violated his due process rights, but not his search and seizure rights.

Felix Arce, permanently employed in the safety-sensitive position of train conductor, had urine taken from him for marijuana testing in May 1984. The urine was taken without violating his search and seizure rights. Mr. Arce's due process claims are moot because they were settled in their entirety in the consent order of February 1, 1990. *See supra* note 15.

James Salazar, permanently employed in the safety-sensitive position of bus operator, had urine taken from him for marijuana testing on October 30, 1984, in violation of his due process rights, but not his search and seizure rights.

John Fa, permanently employed in the safety-sensitive position of bus operator, had urine taken from him on June 24, 1985, in violation of his due process rights, but not his search and seizure rights. In addition, the result of Mr. Fa's Section 75 hearing is found to have violated principles of collateral estoppel. Mr. Fa's motion to amend his complaint is denied.

In light of the aforementioned agreement to bifurcate the issues of liability and remedy, this Opinion does not decide the appropriate remedies. All counsel are to attend a conference, on June 19, 1990 at 9:00 A.M., to set a schedule for resolving the variety of legal and factual issues presented by the matters of retroactive and prospective relief for constitutional violations.

IT IS SO ORDERED.