**Deborah WATSON, Plaintiff,**

v.

**Brendan SEXTON, individually and as City Commissioner of Sanitation; Robert C. Ross, individually and as Director of Personnel, New York City Department of Sanitation; Robert Bolstad, individually and as supervisor, New York City Department of Sanitation; and The City of New York, Department of Sanitation, Defendants.**

**No. 89 Civ. 0225 (MBM).**

United States District Court,
S.D. New York.

Jan. 15, 1991.

Glennia R. Campbell, Bronx Legal Services, Bronx, N.Y., for plaintiff.

Victor Kovner, Marilyn Richter, Michael Kaufman, Corp. Counsel, New York City, for defendants.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff Deborah Watson was dismissed from her job as a probationary New York City Department of Sanitation ("DOS") Enforcement Agent, allegedly in part for refusing to take a drug test, and sues under 42 U.S.C. § 1983 claiming deprivation of her right to be free of unreasonable searches and seizures, and deprivation of her job and reputation without due process. The alleged unreasonable search and seizure implicates a liberty interest protected by the Fourth Amendment; the deprivation of job and reputation allegedly without due process implicates a liberty interest protected by the Fourteenth Amendment. Now before the court are cross-motions for partial summary judgment and/or to dismiss on the pleadings brought by defendants DOS and three of its employees sued individually, and by plaintiff. The individual defendants are Brendan Sexton, the Commissioner of DOS, Robert C. Ross, DOS's personnel director, and Robert Bolstad, plaintiff's supervisor.

For the reasons set forth below, the individual defendants' motion to dismiss plaintiff's Fourth Amendment claims and her deprivation of property claim is granted, and their motion to dismiss plaintiff's claim for deprivation of liberty without due process is denied. DOS's motion to dismiss plaintiff's claims based on (1) failure adequately to train employees, and (2) deprivation of property without due process, is granted. DOS's motions to dismiss her Fourth Amendment and deprivation of liberty claims is denied. Plaintiff's motion for summary judgment is denied in all respects.

## I.

Watson's duties as a Sanitation Enforcement Agent included:

Under supervision, is responsible for the enforcement of certain laws, rules, regulations of the New York City Health and Administrative Codes, New York State Public Health Law (Canine Waste), New York State Vehicle and Traffic Laws, and New York City Traffic Regulations; prepares and issues summonses for certain violations thereof.

Visually inspects commercial and residential establishments, streets, sidewalks, and crosswalks in assigned field territory for violations of applicable Health, Sanitation and Administrative laws; writes summonses for violations; ... Provides security at Department facilities; checks vehicles entering and leaving Department facilities, and keeps records and writes reports relating thereto.... Operates a motor vehicle in the performance of duties....

(Def.Exh. C)

At the time of the events underlying this lawsuit, plaintiff worked under the supervision of defendant Bolstad. According to plaintiff, on July 29, 1987, she felt sick and asked another supervisor, Angel Santana, if she could go home. Santana asked a clerk to check with headquarters, and upon hearing that plaintiff had one sick day and one vacation day left, signed an authorization allowing plaintiff to leave. Plaintiff was absent for the next two workdays. After plaintiff returned to work, Bolstad asked her for medical documentation of her days out. Defendants contend that this request was made pursuant to DOS regulations, which state in part: "[d]ocumenta-

tion for sick leave will be required when: ... reporting sick the day before or the day after chart day [scheduled day off], Sundays or Holidays." (Def.Exh. F) According to plaintiff, she told Bolstad that she did not go to a doctor and was not required to submit documentation under DOS policy because the supervisor had confirmed that she had sick time coming to her. According to plaintiff, Bolstad threatened to mark her AWOL if she did not provide a note and began screaming at her, accusing her of being irresponsible and not caring about her job. Plaintiff claims that she responded to his abuse by becoming visibly shaken and raising her voice to him. She ended the confrontation by slamming her summons book on his desk and threatening to quit. Defendants contend that plaintiff simply refused to comply with Bolstad's request, although they agree that she became upset and slammed her radio and summons book down on a desk.

Bolstad prepared a memorandum to the DOS medical clinic describing plaintiff's behavior and asking that plaintiff be examined, and directed her to report to the clinic, in accordance with § 8.1 of DOS Policy and Administrative Procedure No. 85–05, as amended ("PAP 85–05"), which provides in part:

> It is also the supervisor's responsibility to evaluate the performance of his or her employees and to ensure that they are job fit at all times. When a supervisor has reasons to question an employee's job fitness and suspects that the lack of job fitness is related to the use of prohibited substances, he or she should document the incident and escort the employee immediately to the Clinic. In order to provide the most appropriate help, employees will be given a full medical evaluation which may include a substance abuse test and a referral to EAU [Employee's Assistance Unit].

(Def.Exh. I) Bolstad testified at his deposition that he did not believe when he wrote the memorandum that plaintiff was acting under the influence of drugs or alcohol (Bolstad Tr. 178–79), but rather that some other problem was making her a danger to herself and others. He gave the memoran-dum to another DOS supervisor and asked him to escort Watson to the clinic.

At the clinic, plaintiff met with Dr. Joan Schmuggler, a psychiatrist employed by DOS. They discussed the incident with Bolstad. Plaintiff told the psychiatrist that she had been unfairly given two AWOLs. Dr. Schmuggler asked plaintiff a series of questions, including questions about her drug and alcohol use and about any problems she might be having at home. Dr. Schmuggler's notes of the meeting are as follows:

> [S]he has a nervous stomach & diarrhea & is missing a lot of days. Pt. has not seen M.D. here. Pv't M.D. says it may be colitis or irritable bowel. Pt. taking Lomotil 1 tab a day. Denies drinking or drug use. Diarrhea started when pt. started job & she feels it is job related.... Situational anxiety with diarrhea. Plan—Regular Duty. To see M.D. here for workup.... urine for toxicology today.

(Def.Exh. K)

According to plaintiff, she was in the clinic that day, August 5, for five hours and when asked to provide a specimen for urinalysis, was unable to urinate. She was asked to return the next day to submit to the test. Plaintiff reported to the clinic the next day and, according to plaintiff, provided a specimen by urinating into a cup, and then pouring some of the urine into a smaller vial, as instructed by the nurse. She alleges that the nurse told her to discard the rest of her sample. She claims that on leaving the clinic, the nurse stopped her and told her that her sample was insufficient and that she would have to give another. Plaintiff admits that she became angry, refused to comply and left the clinic. Defendants contend that plaintiff never produced sufficient urine and that when asked to provide another specimen, plaintiff loudly abused the nurse and left the clinic. Plaintiff was immediately suspended from duty for violating § 5.6 of PAP 85–05, which states that "refusal to submit to a substance use test is a violation of this rule."

On August 6, 1987 plaintiff was sent a "Notice to Report to Trial/Suspension Notice," telling her that she was suspended without pay for a violation of Department regulations and ordering her to appear for a Departmental Trial. On August 20, 1987, plaintiff was sent a notice stating that the hearing had been cancelled. As a probationary employee, plaintiff was not entitled to a termination hearing. By letter dated August 28, 1987, plaintiff was informed that her employment was terminated. An intra-DOS memorandum recommended her termination for the following reasons: (1) abuse of Department Time and Leave Rules and Regulations, including three AWOLs during her probationary year (9/17/86, 9/27/86 and 3/4/87), and, in addition, (2) refusal to submit to a substance use test, and being loud and abusive at the clinic. The memorandum also noted that plaintiff was late six times for a total of 2 hours and 51 minutes, and contains a summary of evaluations she received over the four quarters of her probationary year. The evaluations for the most part discuss her poor attendance. Her final evaluation states: "Has 28 days out sick, and LWOP [leave without pay] ... Is becoming an unproductive worker on job and should be terminated.... No hope for improvement here." (Def.Exh. Q)

## II.

■ The individual defendants assert qualified immunity as a defense against plaintiff's Fourth Amendment claim. Under the doctrine of qualified immunity, government employees, such as individual defendants Sexton, Ross and Bolstad, are immune from § 1983 liability for their actions so long as those actions could reasonably have been thought consistent with the federal statutory or constitutional rights they are alleged to have violated, "assessed in light of the legal rules that were 'clearly established' at the time [the actions in question] were taken." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). The Supreme Court explained in *Anderson:*

This is not to say that an official action is protected by qualified immunity unless

the very action in question has previously been held unlawful, ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 640, 107 S.Ct. at 3039.

Even assuming that plaintiff's federal statutory or constitutional rights were violated, it was not clearly established in 1987, when the actions affecting plaintiff were taken, that the urinalysis conducted here was a "search" within the meaning of the Fourth Amendment. As late as January 1989, this court found that requiring urine specimens as part of a physical examination to determine fitness for employment did not constitute a Fourth Amendment search. *See Fowler v. New York City Dept. of Sanitation*, 704 F.Supp. 1264, 1270 (S.D.N.Y.1989). That the New York Court of Appeals determined in *Patchogue–Medford Congress of Teachers v. Board of Education*, 70 N.Y.2d 57, 510 N.E.2d 325, 517 N.Y.S.2d 456 (1987), that compulsory drug testing by government employers constitutes a search under the Fourth Amendment shows only that another court ruled otherwise, not that that ruling was clearly established. According to the Second Circuit: "It is clear from this conflict of opinion, especially the decisions within this Circuit, that there was no unequivocal holding in 1986, *or even until Skinner in 1989*, that urinalysis is a fourth amendment search." *Molinelli v. Tucker*, 901 F.2d 13, 16 (2d Cir.1990) (emphasis added). Accordingly, plaintiff's § 1983 claim against defendants Sexton, Ross and Bolstad for violation of a Fourth Amendment right to be free from unreasonable searches and seizures must be dismissed.

## III.

■ Plaintiff's § 1983 claim against DOS based on alleged failure to train must be dismissed for the same reason—that is, that there was no clearly established federal statutory or constitutional right that was violated at the time the actions took place. In *Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court held that a municipality is liable for failure to train government offi-

cials when that lack of training amounts to "deliberate indifference" to the rights of people with whom the officials come into contact. *Id.*, 109 S.Ct. at 1205. The Court held: "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *Id.* To be "deliberately indifferent" to rights requires that those rights be clearly established. Therefore, even if plaintiff could prove that her Fourth Amendment rights were violated by current standards because the City inadequately trained its employees, plaintiff cannot show that the City was deliberately indifferent to rights that were not clearly established in 1987. Plaintiff's § 1983 claim against DOS for failure to train its employees in properly administering the substance abuse policy therefore must be dismissed.

## IV.

The Fourth Amendment's prohibition against unreasonable searches and seizures applies to DOS's employee substance abuse regulations requiring urine testing. *Skinner v. Railway Labor Executives Assoc.*, 489 U.S. 602, 109 S.Ct. 1402, 1412–13, 103 L.Ed.2d 639 (1989); *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685 (1989). The department's urinalysis policy therefore must meet the reasonableness requirement of the Fourth Amendment. To determine reasonableness under the Fourth Amendment the court must balance individual privacy interests and expectations against legitimate government interests. *Von Raab*, 109 S.Ct. at 1390; *Skinner*, 109 S.Ct. at 1414. The standard of "reasonableness" will depend on the persons and particular circumstances involved in each case. *See O'Connor v. Ortega*, 480 U.S. 709, 718, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987).

In the absence of any compelling governmental interest, such as the need to protect the public safety, the government must show it has reasonable individualized suspicion of substance abuse in order to compel an employee to give a urine sample for substance abuse testing. *Burka v. New York City Transit Authority*, 739 F.Supp. 814, 828 (S.D.N.Y.1990). Reasonable suspicion of substance use must be based upon specific objective facts and the rational inferences that may be drawn from those facts. *Coppinger v. Metro–North C. Railroad*, 861 F.2d 33, 35 (2d Cir.1988). Defendants contend that plaintiff was ordered to submit a urine sample for drug testing based upon reasonable individualized suspicion. Dr. Schmuggler, who ordered the urinalysis, testified that although she could not recall her interview with plaintiff, her suspicion of substance abuse was based on plaintiff's frequent absences, stomach problems, and diarrhea. She admits that according to her notes, plaintiff did not appear to be under the influence of drugs or alcohol during the interview. (Schmuggler Tr. 41–42) Defendants argue that repeated unjustified absences from work are a sign of drug abuse and alone create an inference of such abuse. The Appellate Division case they attach, however, indicates that mere absences without some affirmative manifestation of substance abuse is not sufficient to constitute reasonable suspicion. *Wilder v. Koehler*, 556 N.Y.S.2d 28 (1st Dept.1990). Dr. Schmuggler cannot recall her interview with plaintiff, and her notes show that she believed plaintiff was not under the influence of drugs or alcohol. Therefore, if reasonable individualized suspicion of substance abuse is necessary under these circumstances, there is a triable issue of fact as to whether Dr. Schmuggler had a reasonable suspicion that plaintiff was under the influence of drugs or alcohol at the time she ordered the urine test.

In the alternative, defendants contend that plaintiff's job was safety sensitive, which provides a sufficiently compelling governmental justification for urine testing even without reasonable individualized suspicion. Such a governmental justification may subject an employee to urinalysis without reasonable individualized suspicion that the employee is under the influence of drugs. *Von Raab*, 109 S.Ct. at 1392 (government employees involved in drug

interdiction or who carry firearms); *Skinner,* 109 S.Ct. at 1419 (government employees who operate public transportation). Plaintiff was required occasionally to drive a car to and from her rounds. She also had to direct traffic during snow and other emergencies—an activity which, according to defendants, has a direct impact on the safety of the public at large.

■ Plaintiff contends that she drove on the job infrequently and that the compelling governmental interest found in *Skinner* and *Von Raab* does not and should not extend to every government job in which an employee incidentally drives a car. I agree. In *Burka,* Judge Patterson held that New York City Transit Authority workers who drive a car while on the job are in safety-sensitive positions: "Like a gun, a motor vehicle on a public motorway can instantly become a deadly instrument if misused." *Id.,* 739 F.Supp. at 822. But that logic, extended, would justify drug testing for anyone who is licensed to drive a car. Nor would it be administratively feasible to measure this interest *ad hoc,* based on the frequency of a particular employee's driving, in order to determine whether that employee may be tested randomly for substance abuse. Here, the rule of law must be a rule of thumb. When the employee's duties require driving, such as the duties of one who patrols or makes pick-ups, that employee's position is safety sensitive. When driving is only incidental to other duties that engage no safety concern, the employee's position is not safety sensitive. Watson's duties are in the second category.

Plaintiff argues also that the portions of PAP 85–05 that were applied to her are vague and overbroad. PAP 85–05 requires substance use tests in the following circumstances: (1) after vehicle accidents causing personal injury or significant property damage; or (2) after a physical altercation. The supervisor may order a medical evaluation, which *may* include a substance use test: (3) if the employee has been involved in an act of vandalism; and (4) when the supervisor has reason to question an employee's job fitness. (5) If the employee's job performances is judged unsatisfactory, the supervisor may refer the employee to the clinic for an evaluation "if it is believed that intervention by the clinic or EAU could lead to improved job performance." (Def.Exh. I, p. 12) Plaintiff maintains that she was sent to the clinic pursuant to (2), (4), or (5) above. Only provision (2)—involvement in a physical altercation—would require that she submit to substance abuse testing. The undisputed testimony of Dr. Schmuggler, who ordered the substance abuse test, was that she understood Bolstad to have requested that plaintiff undergo a psychiatric evaluation, which *may* include a substance abuse test. Plaintiff therefore must have been sent to the clinic pursuant to either (4) or (5), neither of which mandates drug testing.

■ Plaintiff contends that these provisions are impermissibly vague and overbroad because they allow testing on "less than a reasonable, articulable suspicion that the employee is under the influence of illegal drugs." PAP 85–05 gives no direction or criteria for the supervisor to follow in making the determination that the employee may have a alcohol or drug problem. The lack of criteria may cause supervisors to require drug testing if there is any suspicion, however slight, of drug abuse. Dr. Schmuggler testified that if she had "a suspicion" of drug abuse, she would order a substance abuse test. (Schmuggler Tr. 34)

The Supreme Court does not recognize the overbreadth doctrine outside of the limited context of the First Amendment. *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). Plaintiff therefore cannot sustain an overbreadth challenge to the regulations.

Provisions (4) and (5) of DOS PAP 85–05 do not include lists of specific objective criteria which can be used to determine whether an employee is under the influence of drugs or alcohol. In this sense they could be considered general or vague to a layman. But the decision to direct the employee to undergo a substance abuse test has not been left to laymen. That

decision lies in the discretion of medical personnel at the clinic who, although they may not be trained in applying legal standards, are surely in the best position to recognize the symptoms of substance abuse. Dr. Schmuggler, a trained psychiatrist, was head of the Inpatient Alcohol Detoxification and Rehabilitation Unit of Van Etten Hospital from 1979 to 1982. She also worked as a staff psychiatrist assigned to an outpatient alcohol treatment program at Cabrini Hospital. As of the time of her deposition in January 1990, she had been a staff psychiatrist at the Adult Methadone Maintenance Program at New York Hospital Cornell Medical Center for at least five years.

Plaintiff tries to connect Bolstad to the decision to order her to undergo a substance abuse test. Dr. Schmuggler understood from Bolstad's letter that he wanted plaintiff to undergo a psychiatric evaluation, which would not necessarily include a urine test. (Schmuggler Tr. 44) Although Bolstad did not believe that plaintiff was under the influence of drugs or alcohol, he testified that he knew plaintiff would probably be given a substance abuse test prior to being referred to EAU. (Bolstad Tr. 187) The evidence shows there is no question that Bolstad did not order a substance abuse test. There is also no question that Dr. Schmuggler believed it was within her discretion to order plaintiff to undergo the test. Accordingly I find Bolstad did not make the decision that plaintiff submit to urinalysis.

## V.

■ Plaintiff's deprivation of property claim against defendants, based on termination of her employment without a hearing, also must be dismissed. As a probationary employee, plaintiff had no expectation of continued employment that rises to a property interest protected by the due process clause of the Fourteenth Amendment.

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). A property interest in employment "arises only where the state is barred, whether by statute or contract, from terminating (or not renewing) the employment relationship without cause." *S & D Maintenance Co. v. Goldin,* 844 F.2d 962, 967 (2d Cir.1988). A probationary employee may be terminated without a hearing and without a statement of reasons unless the dismissal was for a constitutionally impermissible purpose or in violation of statutory or decisional law. *York v. McGuire,* 63 N.Y.2d 760, 761, 469 N.E.2d 838, 480 N.Y.S.2d 320, 321 (1984).

Plaintiff claims she was entitled to a hearing for two reasons: first, that she was terminated for constitutionally impermissible reasons, and second, that she was sent notice that she would be granted a hearing,[1] although the notice was subsequently revoked. That plaintiff was allegedly terminated for constitutionally impermissible reasons means only that she may be entitled to challenge the discharge, not that she is not an at-will employee or that she has a property interest in her job. *See Voorhis v. Warwick Valley Central School District,* 92 A.D.2d 571, 459 N.Y. S.2d 325, 327 (2nd Dep't 1983). That she inadvertently was sent a notice to appear for a hearing does not suggest that there was more than a unilateral expectation on the part of the plaintiff that, as a probationary employee, she was entitled to a hearing. Neither of these allegations is sufficient to state a claim that plaintiff was

---

**1.** The notice was a form notice entitled "Notice to Report to Trial/Suspension Notice" and stated in part: "As of this date 8/6/87 you are suspended for an alleged violation of PAP # 85–05 on 8/6/87. You are hereby ordered to appear for your departmental trial on the above-mentioned charges which will be held on Tue.,

9/1, 1987 at 11:00 a.m." The notice was signed by plaintiff under the statement: "I have just read, acknowledged, and received the above notification of my trial date and my suspension." On August 20, 1987, plaintiff was advised by mailgram that her hearing date had been cancelled.

denied property without a hearing in violation of the due process clause of the Fourteenth Amendment.

## VI.

█ Defendants move to dismiss plaintiff's § 1983 claim charging deprivation of liberty without due process of law. Plaintiff alleges that defendants' actions and the charges they leveled against her in connection with the termination, were incorporated in her personnel file, which was made available to the U.S. Postal Service and caused her application for employment at that agency to be rejected. She alleges that false and defamatory accusations were included in the personnel file without prior notice and an opportunity to be heard on the merits of the charges against her, thereby depriving her of due process in violation of the Fourteenth Amendment.

"A government employee's liberty interest is implicated where the government dismisses him based on charges 'that might seriously damage his standing and associations in his community' or that might impose 'on him a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities.'" *Brandt v. Board of Cooperative Educational Services, Third Supervisory Dist.*, 820 F.2d 41, 43 (2d Cir.1987) (quoting *Board of Regents*, 408 U.S. at 573, 92 S.Ct. at 2707). Plaintiff must prove that she was dismissed based on charges that might seriously damage her "good name, reputation, honor, or integrity" or that might impose a stigma that impedes her freedom to exploit other employment opportunities. *Id.* Plaintiff must prove also that the charges were made public by her employer, and allege that those charges are false. *Id.* To show public disclosure, plaintiff need show only that "prospective employers are likely to gain access to [her] personnel file and decide not to hire [her], then the presence of the charges in [her] file has a damaging effect on [her] future job opportunities." *Id.* at 45. That the informa-

tion may be released only with the signed authorization of the plaintiff will not prevent her from meeting this standard. *Id.* See also *Burka v. New York City Transit Authority*, 739 F.Supp. 814, 834 (1990) ("Even in the presence of a nondisclosure policy, there still may be a likelihood of disclosure if the record shows that plaintiff, upon applying for jobs in the future, would have to grant prospective employers authorization to view his or her files").

As evidence of public disclosure, plaintiff submits a copy of a U.S. Postal Service authorization and release form she filled out when she sought employment there, and another form filled out by DOS in response to the request of the U.S. Postal Service. (Pl.Exh. 6) The authorization and release form gives the Postal Service permission to seek disclosure of "any relevant and necessary information or records ... concerning [her] character, employment, or military service as may be relevant and necessary for a determination of [her] suitability for employment." The form states that failure to consent "may have an adverse effect on your employment opportunities with the Postal Service." On the form sent by the Postal Service pursuant to this authorization and release, DOS disclosed plaintiff's job title and dates of employment, filled out a checklist on the form requesting information about the employee's productivity and work habits,[2] checked "No" in response to the question whether DOS would rehire plaintiff and explained why by stating: "Service Terminated (Under Probation)." Nowhere on the form does it state that plaintiff refused to undergo urinalysis.

Although the allegation that she refused to submit to urinalysis was not disclosed to the Postal Service, plaintiff contends that the presence of this allegedly false and stigmatizing charge in her personnel file, even undisclosed, places her within the *Brandt* rule. In the absence of any statement by DOS that its confidentiality policy

---

**2.** DOS rated plaintiff "poor" in all the following categories: attitude toward work, co-workers, supervisors; ability to understand and follow instructions, willingness to handle all assign-

ments, attendance, punctuality and reliability, appearance, conduct, personal habits, and ability to accept criticism.

will ensure that this information will never be published to third parties, I must agree.

 Defendants argue in the alternative that there is no factual dispute between the DOS and plaintiff about a stigmatizing reason for her termination. They claim that plaintiff cannot dispute that she refused to comply with their request to undergo urinalysis. Plaintiff contends that she did not refuse, but rather that she was too nervous to comply. (Compl. ¶¶ 21–22) Presumably she could also argue that she had a right not to comply with the order if it is found that it violated her Fourth Amendment rights.

Defendants have not shown that there is no genuine issue of fact regarding future public disclosure of plaintiff's personnel file or regarding whether plaintiff can refute the truth of the charge. A statement that plaintiff refused to submit to urinalysis stigmatizes her because it is reasonable to infer from that statement that she is a drug user. In fact, DOS policy holds that an employee's failure to consent to urinalysis can be used to infer that the employee would fail the test. Defendants' motion for summary judgment on plaintiff's deprivation of liberty claim therefore must be denied.

 Plaintiff contends also that the charge included in her personnel file that she abused DOS sick time and lateness policy is false and stigmatizing. Any charge that plaintiff abused DOS sick and lateness policy does not reach the level required to support a deprivation of liberty claim: a charge that might seriously damage her "good name, reputation, honor, or integrity" or that might impose a stigma that impedes her freedom to take advantage of other employment opportunities. *See Saraceno v. Utica*, 733 F.Supp. 538, 543 (N.D.N.Y.1990) (charges of insubordination, misconduct, and inappropriate management are not stigmatizing or sufficiently damaging to implicate a liberty interest); *Nauta v. Poughkeepsie*, 610 F.Supp. 980, 985 (S.D.N.Y.1985) (charges of incompetence and inefficiency not stigmatizing as a matter of law). Plaintiff's claim that she was denied a liberty interest without due process of law with regard to these charges therefore is dismissed.

\*   \*   \*   \*   \*   \*

For the reasons outlined above, individual defendants Sexton, Ross and Bolstad's motion is granted as to plaintiff's Fourth Amendment claims and as to her deprivation of property claim, but is denied as to plaintiff's claim for deprivation of liberty without due process. DOS's motion is granted as to plaintiff's claims based on (1) failure adequately to train employees and (2) deprivation of property without due process. DOS's motion is denied as to plaintiff's Fourth Amendment claim and as to her claim for deprivation of liberty without due process. Plaintiff's motion for summary judgment is denied in all respects.

SO ORDERED.